**UNITED STATES of America,**
Plaintiff,

v.

**Albert M. BRIDELL** and **American Carbon Paper Corporation, Defendants.**

**Nos. 58 CR 475 and 59 CR 157.**

United States District Court
N. D. Illinois, E. D.

Jan. 5, 1960.

A. F. Manion, and Harvey M. Silets, Chicago, Ill., Asst. U. S. Attys., for the Government.

George D. Crowley, Chicago, Ill., for defendant, Albert M. Bridell.

John F. Kelly, Chicago, Ill., for defendant, American Carbon Paper Corporation.

CAMPBELL, Chief Judge.

This consolidated cause, consisting of Case No. 58 CR 475 and Case No. 59 CR 157, having come on for trial upon the stipulations, testimony and exhibits of the parties, is presently before me for disposition. Cause No. 58 CR 475 is an indictment consisting of two counts, the first of which I dismissed November 20, 1958. The second and remaining count charges that defendant Albert M. Bridell "did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1952 by filing a * * * false and fraudulent income tax return * * * in violation of Section 145(b) of the Internal Revenue Code of 1939; to be found in Title 26 U.S.C. Section 145(b)."

Cause No. 59 CR 157 is an indictment consisting of six counts, the first five of which charge the defendant, Albert M. Bridell, with willfully and knowingly attempting to evade and defeat income tax due and owing the United States for the years 1953, 1954, 1955, 1956, and 1957, respectively, by filing false and fraudulent returns for those years in violation of Section 145(b) as to 1953, and in violation of Section 7201 of the Internal Revenue Code of 1954; Title 26 U.S.C. § 7201, as to the remaining years. The sixth count charges a conspiracy between defendant Bridell, defendant American Carbon Corporation and Robert J. Blauner to attempt to evade and defeat income tax due and owing the United States by Bridell and his wife from April 4, 1949, up to and including June 13, 1958, in violation of Title 18 U.S.C. § 371.

It appears from the evidence that defendant, Albert M. Bridell, after practicing law for a year, entered the continuous form printing business in 1935 and in 1936, joined the newly formed American Lithofold Corporation (hereinafter referred to as "Lithofold") of St. Louis, Missouri, as a salesman.

In 1937 he was sent by that corporation to Chicago, Illinois, where he has since remained. He is presently vice president of Lithofold and is also in charge of its advertising program, promotional efforts and salesman education.

In 1943, defendant, American Carbon Corporation (hereinafter referred to as "Carbon"), an Illinois corporation, was formed for the purpose of manufacturing carbon paper, inked ribbons and items related thereto and more specifically, for the manufacture of "one-time carbon paper" to be sold and supplied to Lithofold.

Since its inception, defendant, Bridell, has been president, a director and shareholder of Carbon. Bridell's father-in-law, R. J. Blauner, was vice-president of Lithofold when Carbon was incorporated, and is presently president and treasurer. R. J. Blauner, since its incorporation, has been treasurer, a director and shareholder of Carbon. Since September 15, 1945, no person unrelated to the Bridell or Blauner families has acquired, owned or held any of the capital stock of Carbon. Nor has any unrelated person to the Bridells or Blauners served as a director. Since 1947, the majority of the capital stock of Lithofold has been held by the Bridells, Blauners and Carbon. From 1944 through 1957, the percentage of sales by Carbon to Lithofold out of total sales ranged between 96 per cent in 1944 to 28 per cent in 1957.

In 1946, R. J. Blauner purchased a home in Highland Park, Illinois, named "Tara" at his wife's suggestion and in which they lived, until October, 1950. Later the word "Tara" was and is currently used as a trade name for Carbon. In 1948, Bridell and his wife sold their Wilmette home and moved to "Tara" where they have since resided with their

children. On April 6, 1949, "Tara" was conveyed to the Bridells as joint tenants.

During December of 1946, one, Virlon Furrow, began working at "Tara" as caretaker and maintenance man and was paid personally by Blauner for that month. On December 30, 1946, he made application for employment with Carbon and was subsequently placed, at Bridell's direction, upon the Carbon payroll. Furrow continued working exclusively at "Tara" until his death, February 17, 1958. During this entire period his wages were paid by Carbon.

One, Frank Carretta, was employed as an outside laborer at "Tara" from June 11, 1951, until April 10, 1952. One, Pat Kline, was employed at "Tara" as an outside laborer from May 16, 1951, until November 1, 1951. One, Morris Nygaard, employed by Carbon from November 24, 1950, until April 17, 1952, also did some work at "Tara." One, Ellarea McKinney, was employed as a cook and housekeeper at "Tara" from January 2, 1951, until December 20, 1951. One, Elfreda Peters, was employed as a cook and housekeeper at "Tara" from December 1, 1951, until April 15, 1952. All the above-named persons received wages from Carbon during the respective periods of their employment.

On or about January 3, 1951, R. J. Blauner leased a furnished residence at 9301 Collins Avenue, Miami Beach, Florida, on behalf of Carbon, for a period extending to May 1, 1951, for a rental of $6,000, which was charged to Carbon as a sales promotion expense at the direction of Blauner.

The Bridells and Blauners, among others, stayed at 9301 Collins Avenue for varying periods during the leasehold. On or about March 7, 1951, R. J. Blauner entered into a contract on behalf of Carbon to buy a house and grounds, later known as "Presque Rio," located at 708 Royal Plaza, Fort Lauderdale, Florida, for $90,000. The sale was completed on April 27, 1951.

In April of 1951, R. J. Blauner bought a yacht, paid for by Carbon, which was later renamed "Tara." Until its sale in July, 1955, many people were entertained at "Presque Rio" and on the yacht.

Carbon furnished the investment capital for the acquisition of these properties and assumed the indebtedness for their unpaid balance. During the years in question, Carbon paid for: maintenance and repairs; interest; legal and audit fees; capital improvements; administrative expenses; telephone expenses; real estate, personal property and franchise taxes; insurance; wages paid to Fort Lauderdale house servants, and the yacht captain; interest and finance charges on the yacht; stationary expenses; and depreciation expenses on both properties.

From 1949 through 1954, Bridell prepared the individual income tax returns on behalf of himself and his wife. Their later individual returns were prepared by Carbon auditors, Ernst & Ernst. No reference was made upon the individual returns of the Bridells as to the employment of Virlon Furrow until their 1957 return was filed in June of 1958 containing a statement to the effect that wages paid Furrow were not considered as income to the Bridells, but as a business expense to Carbon and properly deductible by Carbon, as such. Prior to the 1956 Carbon corporate income tax return which listed Furrow's wages as a "promotional expense" at "Tara," there was no mention in Carbon corporate returns as to Furrow's employment at "Tara." The 1957 Carbon corporate return listed wages paid to Furrow under "cost of goods sold."

After a series of investigations by revenue agents and special agents of the Internal Revenue Service extending over a period of years, the first of the two indictments here involved was returned against Bridell in July, 1958. In regard to the substantive counts of the two indictments, it is clear, in view of Stipulation, Part I, Pars. 13, 14, 16 and 18, as well as Government's Exhibit 61, that the alleged additional net income to Mr. Bridell and his wife, as alleged in Count II of Cause No. 58 CR 475, during the

year 1952, is made up of the actual wages paid to Virlon Furrow, Morris Nygaard, Frank Carretta and Elfreda Peters by American Carbon Corporation during that year.

Likewise, in view of Stipulation, Part I, Par. 13, and Government's Exhibit 61, the additional income charged in Cause No. 59 CR 157, as to Count I for the year 1953, Count II for the year 1954, Count III for the year 1955, Count IV for the year 1956, and Count V for the year 1957, is made up of the actual wages paid to Virlon Furrow by American Carbon Corporation during those years. The conspiracy count relates not only to the employment of Furrow and others who worked at "Tara" and who were paid wages by Carbon, but extends to the use of the herein described Florida property as well. It alleges eleven overt acts.

Section 145(b) of the Internal Revenue Code of 1939, Title 26 U.S.C. § 145 (b) provides:

"Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined * * * or imprisoned * * *."

Section 7201 of the Internal Revenue of 1954 provides:

"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined * * * or imprisoned * * *."

Title 18 U.S.C. § 371 provides:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined * * * or imprisoned * * *."

As pointed out by the Supreme Court of the United States in Spies v. United States, 317 U.S. 492, at pages 496, and 497, 63 S.Ct. 364, at pages 366–367, 87 L.Ed. 418, Section 145(b), provided the climax of a variety of sanctions existing at that time to insure payment of tax. Likewise today, Section 7201, a derivative section from Section 145(b), provides the climax of a variety of sanctions to insure payment of tax.

From a casual reading of Sections 145 (b) and 7201, it is obvious that the phrases "willfully attempts" and, "in any manner," do not lend themselves to rigid definition. As to the meaning of the word "willful," much has been written. In United States v. Murdock, 290 U.S. 389, at pages 395, 396, 54 S.Ct. 223, at page 226, 78 L.Ed. 381, the Supreme Court stated:

"The revenue acts command the citizen, where required by law or regulations, to pay the tax, to make a return, to keep records, and to supply information for computation, assessment, or collection of the tax. He whose conduct is defined as criminal is one who 'willfully' fails to pay the tax, to make a return, to keep the required records, or to supply the needed information. Congress did not intend that a person, by reason of a bona fide misunderstanding as to his liability for the tax, as to his duty to make a return, or as to the adequacy of the records he maintained, should become a criminal by his mere failure to measure up to the prescribed standard of conduct."

In Spies v. United States, the Supreme Court stated at pages 497, and 498 of 317 U.S., at page 367, of 63 S.Ct.:

"The difference between willful failure to pay a tax when due, which is made a misdemeanor, and willful

attempt to defeat and evade one, which is made a felony, is not easy to detect or define. Both must be willful, and willful, as we have said, is a word of many meanings, its construction often being influenced by its context. * * * It may well mean something more as applied to nonpayment of a tax than when applied to failure to make a return. Mere voluntary and purposeful, as distinguished from accidental, omission to make a timely return might meet the test of willfulness. But in view of our traditional aversion to imprisonment for debt, we would not without the clearest manifestation of Congressional intent assume that mere knowing and intentional default in payment of a tax where there had been no willful failure to disclose the liability, is intended to constitute a criminal offense of any degree. We would expect willfulness in such a case to include some element of evil motive and want of justification in view of all the financial circumstances of the taxpayer."

In Holland v. United States, 348 U.S., 121, at page 139, 75 S.Ct. 127, at page 137, 99 L.Ed. 731, the Supreme Court stated:

"A final element necessary for conviction is willfulness. The petitioners contend that willfulness 'involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income.' This is a fair statement of the rule. Here, however, there was evidence of a consistent pattern of under reporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their verdict must stand."

In United States v. Glascott, 7 Cir., 216 F.2d 487, at page 490, Judge Schnackenberg of our Court of Appeals stated:

"The key word in this statute is 'wilful.' It is an essential ingredient of the crime. Wilful is distinguished from accidental. Under this statute that which is wilful is an actual, intentional wrongdoing with the purpose of evading the tax. It is not established by negligence, however gross. Wilfulness is a subjective state in most instances. This subjective state, of course, may be shown to exist by various statements and conduct."

In regard to the word "attempt," the Supreme Court in Spies v. United States, supra, 317 U.S. at pages 498, 499, 63 S.Ct. at page 368, stated:

"It is not necessary to involve this subject with the complexities of the common-law 'attempt.' The attempt made criminal by this statute does not consist of conduct that would culminate in a more serious crime but for some impossibility of completion or interruption or frustration. This is an independent crime, complete in its most serious form when the attempt is complete, and nothing is added to its criminality by success or consummation, as would be the case, say, of attempted murder. Although the attempt succeed in evading tax, there is no criminal offense of that kind, and the prosecution can be only for the attempt. We think that in employing the terminology of attempt to embrace the gravest of offenses against the revenues, Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors. Willful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony."

As to the provision "in any manner," the Supreme Court stated in the same case, 317 U.S. at page 499, 63 S.Ct. at page 368:

"Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so would result in some unexpected limitation. Nor would be by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner.' By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct, the offense may be made out even though the conduct may also serve other purpose such as concealment of other crime."

■ Thus, it is clear that the burden of proof is upon the Government to prove, within the framework that I have discussed, every element of the offenses charged beyond a reasonable doubt, though not to a mathematical certainty. The Government in attempting to maintain this burden in this case has introduced certain evidence into the record to show "pattern of conduct," or "intention" on the part of defendant Bridell to which objections have been made of irrelevancy and prejudice. These portions of the record merit some legal discussion before attempting any analysis of the evidence before me. Since, as pointed out in the cases I have just cited, a willful attempt to defeat and evade taxes is often concerned with the intention or subjective state of the defendant, the question may arise as to what conduct or statements on the part of the defendant would be admissible to show the required intention. Since there is talk of "pattern

of conduct," in the record, I think a distinction should be drawn.

■ It is a basic principle of evidence that when the guilt of a party depends upon the intent with which an act was done, it is relevant to show other similar acts by the same person and of the same effect at about the same time or connected with the same subject matter. The legal relevancy of such evidence is based upon logical principles which go to negate innocent intent and is to be distinguished from evidence introduced to establish design or system which is usually invoked when the very doing of the fact charged is still to be proved. Wigmore, Evidence, 3rd Ed. Vol. 2, pp. 196–205; Holland v. United States, supra; Malone v. United States, 7 Cir., 94 F.2d 281.

■ Since this cause concerns itself primarily with the subjective state or intention of Bridell, it follows that evidence of collateral, similar or connected conduct with reference to his income tax is admissible to show his intention in regard to the specific counts of the indictments. Defendants have objected to the evidence introduced in support of the conspiracy count as being irrelevant, beyond the substantive counts and prejudicial. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790; United States v. Rosenblum, 7 Cir., 176 F.2d 321. Their objections must fall, since, first, this is not a jury case, and second, much of the evidence presented as to the conspiracy count is likewise relevant to prove intention as to the substantive counts. Defendants also contend that there can be no conspiracy between a corporation and its officers. United States v. Carroll, D.C., 144 F. Supp. 939. I am of the opinion that the conspiracy count does not overextend the fiction of corporate personality in the instant case. See United States v. Kemmel, D.C., 160 F.Supp. 718, and the various cases cited therein.

The theory of the Government may be summarily stated as follows: Carbon is basically a family structure revolving around the defendant Bridell wherein

benefits to Carbon flow to the individual members of the family by corporate payment of the salaries and wages of personal employees at defendant Bridell's Highland Park home and by the personal use and enjoyment of the Florida property at Carbon's expense. This personal benefit is taxable income to Bridell upon which, by subtle deception, he has willfully attempted to evade and defeat taxes due and owing the United States.

The theory of defendants may be summarized as follows:

Defendant Bridell hired Furrow as a corporate employee because he believed that his salary was a proper corporate expense, since he provided services of a nature over and above that required for personal needs, first of Mr. Blauner and then those of the Bridell family at their "showplace" estate "Tara." The additional employees who appear on the payroll were, in defendant Bridell's judgment, in the same category. He expended substantial personal funds for the support and maintenance of his family and acted in good faith without any willful intent to evade his tax obligation.

As to the Florida properties, it is defendants' contention that such properties were acquired for business entertainment and used primarily for business entertainment. The personal use the Bridells received from the use of the Florida properties was incidental to the business use and did not result in taxable income.

I now consider whether or not the Government has proven an additional tax to be due and owing the United States from defendant Bridell for the substantive counts of the two indictments covering the calendar years 1952 through 1957.

█ I have carefully analyzed the stipulations, exhibits, testimony of the Government agents and defendant Bridell, as well as the individual tax returns of Bridell and his wife. I find that the services rendered by the corporate employees to Bridell and his family at "Tara" resulted in additional income to Bridell upon which there is a tax due and owing the United States for each of the years in question. The service of

Furrow directly served the maintenance and preservation of the Bridell home, a direct benefit to Bridell and his wife. The services of Nygaard went to the capital improvement of the Bridell home, a direct benefit to Bridell and his wife. The services of Elfreda Peters included care of the household and the Bridell children while the Bridells were in Florida, again a direct benefit to Bridell and his wife. Carretta's services in assisting Furrow was also a direct benefit to Bridell and his wife. These services constitute an economic benefit and income to Bridell and his wife. The theory of the defendant that the wages paid to these corporate employees represents a proper corporate expense and does not represent income to Bridell is in my opinion, not supported by the evidence.

I now consider whether or not there was a willful attempt on the part of Bridell to defeat and evade these taxes.

From the Government's viewpoint, the major factors of evidence which go to prove its theory, are:

(1) Bridell is a man possessed of a legal education who up until 1955 prepared his own income tax returns, wherein he deducted unreimbursed business expense items and practiced "percentage deductions" in a meticulous, consistent pattern (Transcript, pp. 408–413, and 422–424.) In his 1950 income tax return, Bridell claimed a reimbursed business expense item as an unreimbursed business expense item (Government's Ex. 53, 54.) In his 1953 income tax return, Bridell deducted the expenses of a party at "Tara" on June 10, 1953, as a business expense item. In a conference with Charles A. Yerkes, Internal Revenue Agent, on February 20, 1956, Bridell told him this deduction should be allowed. In reality, this business expense item was a graduation party for his son (Stipulation, Part I, Paragraph 34; Transcript, pp. 356–358, and 418.)

(2) Bridell denied that his standard of living was increased when

he moved to "Tara" (Transcript, pp. 542 to 544.) Yet, he had three growing children who received certain benefits of the estate, such as the animals, including a horse and the use of "Tara" for the entertainment of their friends. Mr. Raymond testified that this is one of the reasons Bridell moved to "Tara" (Stipulation, Part I, Par. 35.)

(3) Bridell had an established pattern of heavy business entertainment before he moved to "Tara" (Transcript, pp. 462–465, 493, 494, and Government's Ex. 65.)

(4) The use of the name "Tara" as a trademark or the publicity advantages to be derived therefrom came about after the acquisition of "Tara" and was not the original reason for its purchase (Transcript, pp. 359, 459.)

(5) It was Bridell's idea that Carbon should pay Furrow's wages when Blauner owned "Tara" and subsequently when he and his wife acquired title to the property (Transcript, pp. 333–336.)

(6) Bridell never mentioned the fact that Furrow worked at "Tara" during the many conferences he had with his auditors or the Internal Revenue Service until after the conference of January 31, 1957, when Halliday told Internal Revenue agents of Furrow's employment at "Tara."

(7) The wages charged to Furrow on Carbon's books were classified as maintenance and expediter. Nygaard was classified maintenance and leasehold. McKinney and Peters were classified as administrative (Stipulation, Part I, Par. 24.) Bridell denied knowing how they were classified, yet understood the meaning of the term, "cost of goods sold." Bridell also knew these services were not charged to his personal account. Bridell's daughter was in charge of the Carbon payroll subsequent to 1950 (Transcript, pp. 352, 353, 439–44.)

(8) The apportionment of Nygaard's wages between Bridell's personal account and Carbon came about because of the suggestion of his auditor. Bridell gave no specific percentage to so apportion (Transcript, pp. 429–435.)

(9) Bridell had a time clock installed at "Tara" which was almost identical to the time clock at Carbon. (Stipulation, Part I, Paragraph 25, 33.) Bridell testified he did this to keep track of his employee's time and then stated he often had to tell Furrow to go home because he stayed too late. (Transcript, pp. 355, 356).

(10) Bridell stated he never reviewed his personal account at Carbon with Halliday (Transcript, p. 446.) Halliday testified to the same effect, but before the Grand Jury testified that he did review Bridell's personal account with him once a year (Transcript, pp. 594–599.)

(11) Bridell entertained many personal friends at "Tara" as business customers or prospects. These same people, in many cases, were entertained in Florida, on vacations, at lunches and clubs (Transscript, pp. 474–489, 516–537.)

(12) Bridell entertained an insignificant number of Carbon customers at "Tara" (Transcript, pp. 465–472.) Lithofold customer or sales entertainment had nothing to do with the original purpose in acquiring "Tara" which was to enhance the name of Carbon (Transcript, pp. 481, 482.)

(13) Though Bridell kept personal records of business expense deductions subsequent to 1951, he did not produce them to substantiate his business deductions for those subsequent years (Transcript, pp. 38–382, 413–416.)

(14) The letter Bridell received from Lithofold instructing him to bear business expenses personally was in reality Bridell's idea (Transcript, pp. 536–541; Government's Ex. 6, and 66.)

(15) Bridell stated that "Tara" was of great value to Carbon and that his suppliers favored it. Mr. Birely, a supplier, did in fact suggest that "Tara" be sold (Transcript, pp. 461, 462, 588, 589.)

(16) Blauner testified in a conference with Edward J. O'Leary that his original reason for going to Florida in 1951 was for a vacation, but that while he was down there he got the idea to promote Carbon and Lithofold's sales program, which led to the acquisition of the Florida properties (Stipulation, Part II, pp. 149–156.) Bridell testified that he and Blauner discussed the Florida promotion program, and that Blauner went to Florida for that purpose (Transcript, pp. 384 and 385.)

(17) Blauner began the purchase of the yacht "Tara" as a personal enterprise, but later withdrew his earnest money and allowed Carbon to purchase the yacht (Stipulation, Part II, p. 91.)

(18) Though Carbon paid $5,900 for the Miami Beach, Florida, leasehold, there was a very slight degree of sales promotion connected with that property as to Carbon (Stipulation, Part II, pp. 84–89; Transcript, pp. 548–550.) In 1951, there was a minimal use of the Fort Lauderdale properties for business entertainment of Carbon (Stipulation, Part II, pp. 548–550.) In 1952, the Florida property was used to entertain the Bridells personally, as well as their friends and children's friends on several occasions (Stipulation, Part II, pp. 93–99.) In 1953, the Florida property was also used for personal entertainment, as for example, friends of their children (Stipulation, Part II, pp. 100–106.) In 1954, there is also evidence of personal use of the Florida property as, for example, the entertainment of friends of the Bridell children (Stipulation, Part II, pp. 107–114.) In 1955, the Florida property was used for the personal

entertainment of the Bridells, as for example, friends of their children and for their son's honeymoon (Stipulation, Part II, pp. 114–120.)

(19) Bridell stated that his standard of living may have been raised by the acquisition of the Florida properties (Transcript, p. 561.)

(20) The acquisition and use of the Florida properties was not profitable to Carbon (Transcript, pp. 555–557; Government's Ex. 68.)

(21) Bridell testified that the Florida properties were always available for corporate use (Transcript, pp. 396 and 397.) Government's Exhibit 67 indicates that this may not be true (Transcript, p. 578.)

(22) Letters of invitation in regard to the Florida property were addressed formally to Bridell's daughter and husband and informally to Bridell's niece (Transcript, pp. 578–580.)

(23) The accounting procedure of Carbon during 1951 was "not proper" in that it had the effect of understating promotion expense. This was the year of the Florida acquisitions (Transcript, pp. 187–190, 270, 271.)

(24) Nigel Campbell, tax consultant to Carbon from 1950 to 1952, told Bridell that he could deduct as corporate expense that portion of total expense attributable to the entertainment of customers (Stipulation, Part II, pp. 140–142.)

(25) On November 15, 1954, Bridell executed an affidavit which stated that the Florida properties had not been used except for business purposes of Carbon and "matters incidental thereto" (Transcript, pp. 403–406; Government's Ex. 41.)

(26) On May 1, 1955, Bridell submitted a brief to the Internal Revenue Service pointing out business associates listed in the logs of the yacht "Tara" from 1951 through 1954. There were various inaccura-

cies in this brief, as for example, the reference to persons as business associates who were, in fact, not business associates (Stipulation, Part II, pp. 144, 145; Transcript, pp. 402, 403, 572; Government's Exhibit 42.)

(27) The Government followed all possible leads in attempting to discover the full extent of business entertainment at "Tara" and in Florida (Transcript, pp. 186, 258–260, 268–270.)

(28) Finally, the Government relies on Wolfe v. United States, 6 Cir., 261 F.2d 158.

The factors which defense urges sustain Bridell's theory are:

(1) Bridell testified that Blauner originally bought "Tara" in a cooperative effort with Bridell to secure a "prestige property" or "showplace" for the purpose of entertaining business guests of Carbon and Lithofold and in order to stimulate the sales promotion picture of both corporations (Transcript, pp. 328–331, 460 and 461.)

(2) The evidence discloses that in the years subsequent to the acquisition of "Tara" up through and including 1957, business guests, prospects and employees of both corporations have been entertained extensively at "Tara." Sales training for both corporations has also taken place at "Tara" (Defendants' Ex. 1A, 1B, 2A, 2B, 3, 4, 5, 17; Stipulation, Part I, Pars. 36–101; Transcript, pp. 481, and 482.)

(3) Bridell testified that though "Tara" worked out as intended, the financial burden proved too heavy for Blauner. Bridell felt that Carbon should pay those expenses over and above the personal needs of Blauner, since Carbon was the beneficiary of those expenses. Since Blauner, living in an ordinary home, would not require a full-time maintenance man, and since "Tara" required such a man, Bridell testified that this is why he had Furrow placed on the Carbon payroll. Carretta, Kline, Nygaard and Peters fell into this same classification, according to Bridell, though their services ended in the early months of 1952 (Transcript, pp. 333, 334, 341–347, 445, and 446.)

(4) Having once classified Furrow's employment as a business expense of Carbon, Bridell never reevaluated this classification until 1957 (Transcript, pp. 353, 354.)

(5) "Tara" came to be known as a trademark for Carbon and was used extensively in the corporation's promotional and advertising programs, both by way of name and picture (Transcript, pp. 284, 359–361; Defendants' Group Ex. 15.)

(6) During each of the years in question, Bridell expended a substantial amount of his personal funds for the needs of his family at "Tara" (Stipulation, Part I, Par. 101; Defendants' Exhibit 6, and 7.)

(7) Lithofold was a substantial customer of Carbon (Stipulation, Part I, Par. 7.) Entertainment of Lithofold customers is a proper business expense to Carbon. Citing Dinardo v. Commissioner of Internal Revenue, 22 Tax Court 430.

(8) Reference was made in the personal account of Bridell at Carbon to Nygaard (Stipulation, Part I, Par. 24; Transcript, pp. 87–90; Stipulation Ex. 6) and to Furrow, (Stipulation Ex. 5.) Bridell was never questioned about Furrow's employment. No fictitious names were used. Halliday freely admitted Furrow was employed at "Tara" when questioned (Stipulation, Part I, Par. 26.)

(9) The employment of Furrow was referred to in the 1956 Carbon corporation income tax return (Stipulation, Part I, Par. 109), in the 1957 Carbon corporate income tax return (Stipulation, Part I, Par. 110), and in the 1957 individual in-

come tax return of Bridell and his wife (Stipulation, Part I, Par. 106.) This was done upon the advice of his attorney, Mr. Taylor (Transscript, pp. 373–376.)

(10) Bridell used the proceeds of the sale of his Wilmette home to rescue Carbon from its then financial difficulties (Stipulation, Part I, Par. 10; Transcript, pp. 336–338.)

(11) Mortgages were placed upon "Tara" in 1953 and 1955, by the Bridells, to secure loans from Walter E. Heller & Co. and Butler Paper Co., respectively, to Carbon and Lithofold. The Bridells were legally obligated to keep the premises in good repair under threat of foreclosure. Furrow was necessary to the maintenance of "Tara," in accordance with the requirements of these mortgages. (Stipulation, Part I, Pars. 102–104; Transcript, pp. 376–379.)

(12) Bridell testified that the acquisition of the Florida properties was pursuant to a plan for a sales promotion program on the part of Carbon and Lithofold (Transcript, pp. 384, and 385, 390–395.)

(13) The Florida properties were used extensively for business entertainment (Stipulation, Part II, pp. 92–135.)

(14) The books of Carbon revealed the existence of property in Florida and listed employees who worked in Florida on its payroll (Transcript, pp. 120, and 233.)

(15) In its 1955 corporate return, Carbon reported a gain of $4,621.78 on the sale of the Florida properties (Stipulation, Part II, p. 139(a)).

(16) Bridell kept logs in Florida for signatures of his visitors. No one was told not to sign these logs (Stipulation, Ex. 43–47; Transcript, p. 398.) So much for the defendants' contentions.

In my opinion, certain of the factors raised by the Government are subject to specific rebuttal:

(1) The weight to be accorded that evidence going to show meticulous personal preparation of income tax returns on the part of Bridell wherein instances of reimbursed business expense item deductions and personal deductions occurred should be qualified as follows:

(a) Meticulous preparation of income tax returns is not of itself evidence of a willful attempt to defeat and evade tax.

(b) The specific instances wherein Bridell claimed deductions of reimbursed business expense items or personal expense items are negligible when evaluated in relation to the great volume of business deduction items, made necessary by his business, which occur in his returns over the several years in question.

(c) In Bridell's 1953 income tax return, Bridell overstated his tax which error was corrected by Government (Transcript, pp. 303–305.)

(2) As to Bridell's lack of knowledge pertaining to the classification of wages on Carbon's books and his general lack of knowledge as to how these books were kept, Bridell testified that he never had an accounting course, that he never examined the books, and that he spent very little time at the factory (Transcript, pp. 349–352.)

(3) As to the time clock which was installed at "Tara" and the time cards of the respective Carbon employees who worked at "Tara," there is abundant evidence of distinguishing features from those cards used by employees working at Carbon (Stipulation Group Exhibits 7, 8, 9, 10; Stipulation, Part I, Par. 25; Transcript, pp. 121, 748, 749.)

(4) As to the production of personal records subsequent to 1951, it appears that Bridell did originally agree to deliver up those records to the Internal Revenue Service. It was Mr. Taylor, his attorney, who later said that the personal records

of Bridell would not be turned over to the Internal Revenue Service. It further appears that this action was Mr. Taylor's responsibility (Transcript, pp. 151, 179, 181–154, 242, 249, 252.)

(5) In regard to the personal use of the yacht "Tara," Bridell testified that the boat needed "exercise" and that this function was primarily connected with personal usage of the yacht (Transcript, pp. 395, 396, 400; and the case of Hal E. Roach v. Commissioner of Internal Revenue, 20 B.T.A. 1919.)

(6) As to the affidavit executed by Bridell on November 15, 1954, Bridell contends that the words "matters incidental thereto" contemplated family use as he had previously discussed it with Mr. Yore, an Internal Revenue Agent (Transcript, p. 406.) Bridell contends this was not taxable income, citing Paulina DuPont Dean v. Commissioner of Internal Revenue, 9 Tax Court 256. Bridell further testified that he referred to no records in the preparation of the May 1, 1955 brief (Transcript, pp. 402, 403.)

(7) The facts in Wolfe v. United States, supra, relied upon by the Government, are readily distinguishable from the facts presented by this consolidated cause.

The rest of the evidence presented by the Government is inferential as to the question of whether or not there was a willful attempt on the part of Bridell to defeat and evade income tax and, as such, it is subject to the argument of contrary or innocent interpretation urged by defendant.

 In resolving this question, I have taken into consideration the fact that the law is more clearly delineated today, as to the offense charged, than it was during the years in question and also the fact that the receipt of income to Bridell in the instant cause is unusual in that it does not fall within the specifically enumerated sources of income, as contained in Section 22(a) of the 1939 Internal Revenue Code, 26 U.S.C. § 22(a), and Section 61 of the 1954 Internal Revenue Code, 26 U.S.C. § 61. I have also taken judicial notice of the general practice on the part of corporations, particularly during the years in question here, pertaining to business deductions for business entertainment. That practice is now, as counsel are aware, being corrected by the Internal Revenue Service.

The summary I have given of the evidence I do not feel is complete. There are many lesser points of evidence that might be raised and discussed, for one side or the other. I have, however, carefully considered all of the evidence in arriving at my verdict. The Government has prosecuted this case in a most competent and sincere effort to achieve justice.

 It is my considered judgment, however, upon my evaluation and analysis of all of the evidence before me, that the Government has failed to prove, beyond a reasonable doubt, that Bridell has willfully attempted to defeat or evade his tax. Accordingly, I find the defendant, Bridell, not guilty as to Count II of Cause No. 58 CR 475 and Counts I, II, III, IV and V of Cause No. 59 CR 157.

As to Count VI, of Cause No. 59 CR 157, I find that the Government has likewise failed to prove, beyond a reasonable doubt, that a conspiracy existed between Bridell, Carbon, and R. J. Blauner, willfully to attempt to evade and defeat income tax due and owing the United States by Bridell and his wife for the years in question.

Accordingly, I find defendants Bridell and Carbon not guilty as to Count VI of Cause No. 59 CR 157.

Let judgment enter accordingly, and the defendants may go hence without day.