UNITED STATES of America,
Plaintiff,

v.

Isidore GOODMAN, Defendant.

No. 57 CR 31.

United States District Court
N. D. Illinois, E. D.

Jan. 24, 1961.

As Amended Feb. 20, 1961.

Robert Tieken, U. S. Atty., Chicago, Ill., for plaintiff.

Edward J. Calihan, Jr., Chicago, Ill., for defendant.

CAMPBELL, Chief Judge.

This cause, consisting of a one count indictment, having come on for trial upon the stipulations, exhibits and briefs of the parties is presently before me for disposition. The indictment charges concerning the defendant Isidore Goodman that "during the year 1953 * * * owed to the United States of America income tax in the amount of $4,457.48 and who by law was required to pay such income tax on or before March 15, 1954 * * * then and there did willfully fail to pay such tax; in violation of Section 145(a) of the Internal Revenue Code of 1939, Section 145(a), Title 26, United States Code, presently Section 7203 of the Internal Revenue Code of 1954, Section 7203, Title 26, United States Code".

Prior to the assignment of this cause to my calendar from that of the Honorable Win G. Knoch upon his elevation to the Seventh Circuit Court of Appeals, several motions were heard and ruled upon by Judge Knoch. On April 18, 1957, he denied defendant's motion to dismiss the indictment in a memorandum order. On May 24, 1957, in a memorandum order, he denied defendant's motion for bill of particulars. On June 6, 1957, in a memorandum order, he granted and denied various motions of defendant for

discovery. On July 25, 1958, in a memorandum order, he denied defendant's motion to suppress evidence based upon an alleged unlawful search and seizure.

The defendant now makes as part of his defense, three trial motions: (1) that the evidence in government exhibits 61 through 68 (transcriptions of the books and records of the law firm of Perlman, Goodman, Hecht and Chesler) should be suppressed, as having been taken by unlawful search and seizure; (2) that all testimony and exhibits relating to extra-indictment years should be stricken as immaterial and irrelevant; and (3) that government exhibits 101, 102, 103 and 104 should be stricken on the ground that they are incompetent, immaterial and irrelevant.

As to defendant's first motion, Judge Knoch has, in his able memorandum order of July 25, 1958, denied the same motion as a pre-trial matter after full hearing and consideration of the briefs of the parties. Defendant now urges that I "re-appraise" Judge Knoch's finding in light of the evidence now before me.

The facts surrounding the alleged unlawful search and seizure may be summarized from the testimony of five witnesses.

Bernard T. Hecht in abstract testified that: "I first met the Agents on August 8, 1955, when they came to the firm office. Our office had a general policy to cooperate with the Internal Revenue Service. I inquired specifically of the Agents for their identification and Mr. Sheehy showed me his credentials. I asked him to wait just a minute and I went inside and talked with my partners. Other than Mr. Goodman, my partners are Attorneys Chesler and Perlman. The three of us decided that we should make the books available to the Government. I went in and talked with Mr. Goodman. I told him that Sheehy and Conarchy were there. He objected to our showing them the books. I told him we were going to show them the books. He said, 'Well, I object, *but go ahead and do what you want to do.*' I then returned to the outer office, introduced the agents to our bookkeeper, and instructed her to make available to the agents our books and records and a place at which to work. A day or so later, I introduced Mr. Goodman to the agents and left him talking to them." (Stipulation of Government's Witness "I").

Miss Margaret Code testified as follows: "On August 8, 1955, I was introduced by Mr. Bernard Hecht to Mr. Michael J. Sheehy and Mr. Kyran P. Conarchy as Special Agents of the Internal Revenue Service. Thereafter, and for some period of time, these two men came to the firm office, where they usually used the large conference room and from time to time I assisted them in selecting the books and records of the firm which they used and in carrying them into the conference room, and by explaining to them data supporting the entries which had been made in the various journals. Occasionally during the time when they were there, and when the large conference room was not available, Mr. Hecht gave them a large table at which to work, across from the entrance to Mr. Goodman's office." (Stipulation of Government's Witness "J").

The testimony of Isidore Goodman, the defendant, as to what happened is as follows: "Mr. Hecht was familiar with my tax difficulties even prior to 1950. I did not know of any general policy of our firm of cooperating with the Internal Revenue Service. When Agents Sheehy and Conarchy first came into the office, Mr. Hecht did not speak to me at the same time he spoke to the other members of the firm. He went into conference first with Chesler and Perlman without me. They agreed among themselves that they would supply the Government agents the books and records regardless of what I might say. Hecht testified that he asked the agents' permission to tell me that they were examining the books. He then introduced Miss Code and instructed her to make available *our* books and records." (Stipulation of Defendant's Witness "V").

The testimony of Special Agent Michael J. Sheehy is abstracted as follows: "When Agent Conarchy and I went to the office of the firm on August 8, 1955, I was met in the reception room by Bernard T. Hecht, a member of the firm. I identified myself to him and told him my purpose. He conducted us into a large conference room and had us wait there while he sought approval of Mr. Goodman to review the books and records of the firm. When he returned, as a result of what he told us, I understood that we had the approval not only of Mr. Goodman, but of all of the members of the firm, to proceed with reviewing the books and records of the firm. He then introduced us to the bookkeeper and told her to see that we had whatever we wanted of the books and records. We worked on the books from day to day at a place set up first in the conference room. We worked without interference, interruption, or restriction. On August 11, we talked with Mr. Hecht. He left and returned with Mr. Goodman. We identified ourselves to Mr. Goodman and asked him if he had any objection to talking with us at that time. He was cordial and cooperative. He sat down with us and we discussed fully with him the nonpayment of his income taxes. I told him that the records of the firm which we had reviewed showed that he had earned substantial income during the years which he had not paid. I asked him why. He stated that he liked to live high, that he did a lot of entertaining and that his living costs were high. I told him that I noticed many of the firm checks over a period of time, and particularly during the years 1951 through 1954, were going into the American National Bank and Trust Company and reflected amounts of his withdrawals from his distributive share of the firm. He told me that he maintained a bank account there under the name of his son. I asked him why and he said in order to avoid an Internal Revenue levy on his income; that by having the checks made payable directly to himself and depositing them directly in this account, an Internal Revenue levy

would not withhold his funds from him. I turned to Agent Conarchy and asked if he had any questions of Mr. Goodman, and he said he did not. Whereupon, Mr. Goodman asked, 'Is that all, gentlemen?' I said, 'Yes'. Mr. Goodman replied, 'Very well and goodbye, gentlemen', and he left. During the first phase of our investigation, Mr. Goodman was represented by Attorney Bernard Sokol, and later by Attorney Edward J. Calihan. While Mr. Sokol was the attorney, everyone was congenial to me and Mr. Conarchy as we went and came in and out of the office. In the mornings when Mr. Goodman would see us, he would speak saying, 'Good morning', and, on one occasion when we were entering the office in the morning, he held the office door open for us to enter. Part of the time I worked at a table just outside his office door. Later while Mr. Calihan was his attorney, I discovered that certain work sheets were missing. One of the members of the firm, not Mr. Goodman, told me that they were in Mr. Calihan's office, Mr. Goodman's attorney. In a short time, these work sheets were made available to me for us." (Stipulation of Government's Witness "R").

The testimony of Special Agent Kyran P. Conarchy confirms that of Agent Sheehy and goes on to explain an interesting circumstance as follows: "We went into the firm office on August 8, 1955. On August 22, 1955, Attorney Sokol came to our office, that is the Office of the Intelligence Division of Internal Revenue, and introduced himself to us as the attorney for Isidore Goodman. We had a conversation, and, as a result of this conversation, we looked through the records in our office and found the original of a General Power of Attorney appointing Mr. Sokol and signed by Isidore Goodman. This Power of Attorney was dated August 19, 1955, three days earlier. It authorized Mr. Sokol to act for and on behalf of Mr. Goodman in connection with all matters involving taxes for the years 1945 through 1953. With this General Power of Attorney was a copy of a Power of Attorney for each of the

years 1945 through 1953. The original of these yearly Powers of Attorney were located by us in our office a few days later, on August 30. As a result of our conversation with Mr. Sokol and these Powers of Attorney, we continued on our examination of the records of the firm with what we considered blanket authority from Mr. Goodman's attorney. A year later, on August 14, 1956, we had a conversation with Mr. Sokol and he forwarded to the Internal Revenue Service a letter stating that he no longer was acting as counsel for Mr. Goodman and withdrawing the Powers of Attorney which had been filed with us." (Stipulation of Government's Witness "U").

There is no dispute among the witnesses as to what happened. It is clear that when the Agents arrived on August 8, 1955, at the office of the firm of Perlman, Goodman, Hecht and Chesler, they were met by Mr. Bernard T. Hecht of the firm in the reception room. They identified themselves as Special Agents of the Internal Revenue Service, investigating the willful failure to pay taxes of Isidore Goodman. They asked to see the records of the firm. Mr. Hecht acknowledged his understanding of their mission and asked them to wait in the conference room while he conferred with Mr. Goodman. He went inside the suite and talked first with Mr. Perlman and Mr. Chesler. The three of them concluded that in this instance the firm should follow its established practice of full disclosure to and cooperation with the Internal Revenue Service. He then conferred with Mr. Goodman and advised him of this decision of the other members of the firm. Mr. Goodman objected but said, "Go ahead and do what you want to do". In other words, Mr. Goodman did not agree with the other three members of the firm that there should be full disclosure, but he did assert that the action of the firm should be unitary and reflect the decision of the majority. His subsequent conduct confirms the fact that his reservations had, by his own decision, been subordinated to the desires of the majority of the firm. He at no time ever communicated an objection to the Agents, nor asked that any of his partners communicate such objection, and his every act was in resignation to the firm's decision to permit a full review of the firm's records. On one occasion, he conferred with the Agents while they were reviewing the firm's records and answered questions which they asked him concerning matters they found in the records. He was at all times cordial in his conduct towards them. During the early stages of their investigation, his attorney, with Power of Attorney signed by him, confirmed for him a policy of full disclosure, and under this confirmation the Agents proceeded with a review of the records of the firm for more than a year after their first appearance at the firm's office.

Based upon these findings, I conclude as Judge Knoch has already done, that defendant voluntarily waived any claim to privacy he might otherwise have had with regard to government exhibits 61 through 68. Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477. Though United States v. Sferas, 7 Cir., 210 F.2d 69 does not involve transcription of books and records of a law firm, I hold that the principle there stated, namely, that where two persons have equal right to the use or occupancy of premises, either may give consent to a search, and any evidence disclosed can be used against either, is applicable here. Mr. Hecht, the partner in control of the premises gave the agents express consent to review the firm's books and records. I further find that the rationale of United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (also see McPhaul v. United States, 364 U.S. 372, 81 S.Ct. 138, 5 L.Ed.2d 136), is here applicable in view of the evidence before me concerning the operation of the partnership. To this extent, In re Subpoena Duces Tecum, 81 F.Supp. 418 is not persuasive.

Accordingly, the motion of defendant to suppress government exhibits 61 through 68 is denied.

■ As to defendant's second motion, I have before considered and rejected similar arguments. United States v. Bridell, 7 Cir., 180 F.Supp. 268, 273.

Accordingly, the motion to strike all testimony and exhibits relating to extra-indictment years is denied.

As to defendant's third motion, I find, after full consideration of the exhibits in question and the arguments of the parties, that the exhibits are competent, material and relevant.

Accordingly, the motion of defendant to strike government's exhibits 101, 102, 103 and 104 is denied.

The simple issue in this cause is whether or not the failure of defendant to pay his income taxes for the year 1953 at the time required by law was *willful*. The meaning of the word "willful" was before me in United States v. Bridell, supra, with regard to Section 145(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 145(b). There I stated at pages 271 and 272 as follows:

"As to the meaning of the word 'willful,' much has been written. In United States v. Murdock, 290 U.S. 389, at pages 395, 396, 54 S.Ct. 223, at page 226, 78 L.Ed. 381, the Supreme Court stated:

" 'The revenue acts command the citizen, where required by law or regulations, to pay the tax, to make a return, to keep records, and to supply information for computation, assessment, or collection of the tax. He whose conduct is defined as criminal is one who "willfully" fails to pay the tax, to make a return, to keep the required records, or to supply the needed information. Congress did not intend that a person, by reason of a bona fide misunderstanding as to his liability for the tax, as to his duty to make a return, or as to the adequacy of the records he maintained, should become a criminal by his mere failure to measure up to the prescribed standard of conduct.'

"In Spies v. United States, the Supreme Court stated at pages 497, and 498 of 317 U.S. [492], at page 367, of 63 S.Ct. [364, 87 L.Ed. 418]:

" 'The difference between willful failure to pay a tax when due, which is made a misdemeanor, and willful attempt to defeat and evade one, which is made a felony, is not easy to detect or define. Both must be willful, and willful, as we have said, is a word of many meanings, its construction often being influenced by its context. * * * It may well mean something more as applied to nonpayment of a tax than when applied to failure to make a return. Mere voluntary and purposeful, as distinguished from accidental, omission to make a timely return might meet the test of willfulness. But in view of our traditional aversion to imprisonment for debt, we would not without the clearest manifestation of Congressional intent assume that mere knowing and intentional default in payment of a tax where there had been no willful failure to disclose the liability, is intended to constitute a criminal offense of any degree. We would expect willfulness in such a case to include some element of evil motive and want of justification in view of all the financial circumstances of the taxpayer.'

"In Holland v. United States, 348 U.S. 121, at page 139, 75 S.Ct. 127, at page 137, 99 L.Ed. [150] 731, the Supreme Court stated:

" 'A final element necessary for conviction is willfulness. The petitioners contend that willfulness "involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income." This is a fair statement of the rule. Here, however, there was evidence of a consistent pattern of under reporting large amounts of income, and of the failure on petitioners' part to include all of their

852

income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their verdict must stand.'

"In United States v. Glascott, 7 Cir., 216 F.2d 487, at page 490, Judge Schnackenberg of our Court of Appeals stated:

" 'The key word in this statute is "willful". It is an essential ingredient of the crime. Willful is distinguished from accidental. Under this statute that which is willful is an actual, intentional wrongdoing with the purpose of evading the tax. It is not established by negligence, however gross. Willfulness is a subjective state in most instances. This subjective state, of course, may be shown to exist by various statements and conduct.' "

In United States v. Palermo, 3 Cir., 259 F.2d 872, at page 882, the Court explained "willfulness" as it pertains to Section 145(a) as follows:

"Willfulness is an essential element of the crime proscribed by Section 145(a). It requires existence of a specific wrongful intent—an evil motive—at the time the crime charged was committed; viz., failure to pay the tax due at the time required by law. A series of defaults, indicating a pattern of behavior, knowingly and intentionally, made, may suggest the existence of the specific 'evil motive'. Mere laxity, careless disregard of the duty imposed by law, or even gross negli-

gence, unattended by 'evil motive' are not probative of 'willfulness'."

It is the government's contention that the defendant's failure to pay his income taxes for the year 1953 "at the time required by law was accompanied by a willful and contemplated course of conduct perpetrated by the defendant for the purpose of indefinitely or even permanently impairing the government's ability to collect, the consequence of which would be a defrauding of the government of the money."

On the other hand, it is defendant's contention that the failure to pay income taxes for the year 1953 at the time required by law was not "willful" but rather, was due to the financial inability of defendant to pay the income tax.

The defendant Goodman, a 67-year-old married lawyer with two adult children, began defaulting in the payment of his income taxes in 1938, and by 1945, owed $3,633.34 in back taxes. For the taxable years 1945 through 1954, the defendant's income totaled $162,664.65. Tax on those returns totaled $39,409.57. His total assessed tax after estimated deposits totaled $38,717.27. His total interest by December 31, 1954, on the taxes unpaid for the years 1945 through 1954 totaled approximately $9,477.95. The total amount paid by the defendant prior to December 31, 1954 on the taxes for 1945 through 1954 is $2,857.90. Quarterly, estimated tax deposits, usually in the amount of $25.00 were made in connection with estimated tax returns during the years 1945 through 1949. In 1950, defendant stopped making quarterly payments.

| Taxable Year | Account No. | Income Per Return | Total Tax | Assessed Tax (After Estimated Deposit) | Accumulated Int. By 12/31/54 | Total Amt. Paid (Prior to 12/31/54) |
|---|---|---|---|---|---|---|
| 1945 | 46-20-02905241 | $ 5,995.49 | $2,395.73 | $1,995.73 | $ 584.84 | $1,516.44 |
| 1946 | 47-20-03201625 | 19,717.23 | 5,835.04 | 5,735.04 | 2,752.82 | 100.00 |
| 1947 | 48-20-03200479 | 14,998.45 | 3,643.98 | 3,568.98 | 1,417.50 | 143.98 |
| 1948 | 49-20-03279100 | 25,689.02 | 5,572.48 | 5,497.48 | 1,800.00 | 572.48 |
| 1949 | 50-20-03020571 | 9,319.73 | 1,209.40 | 1,134.40 | 345.30 | 125.00 |
| 1950 | 51-20-03002642 | 21,209.73 | 6,529.00 | 6,529.00 | 1,566.96 | 0.00 |
| 1951 | 52-26-0009583 | 12,228.17 | 2,259.60 | 2,259.60 | 358.73 | 400.00 |
| 1952 | 53-23-0014182 | 15,130.32 | 3,348.30 | 3,381.00 | 401.80 | 0.00 |
| 1953 | 54-23-0010970 | 18,372.32 | 4,457.48 | 4,457.48 | 250.00 | 0.00 |
| 1954 | | 20,004.14 | 4,158.56 | 4,158.56 | | 0.00 |
| Totals | | $162,664.65 | $39,409.57 | $38,717.27 | $9,477.95 | $2,857.90 |

Various attempts were made each year by the Collection Division of the Internal Revenue Service from 1943 through 1955 to collect the tax liabilities of the defendant. To summarize, there were three periods of failure at collection. The first period, prior to October 14, 1949, was handled by the Collection Division and consisted of numerous unsuccessful efforts at collection. The second period was that between October, 1949 and April, 1954, when the suspension of collection resulted from the filing of offers in compromise for defendant which were rejected primarily because the offers were too small in relation to defendant's liability and income. The third period was that between April of 1954 and May of 1955, when proposals were made on behalf of defendant by third parties which were either non-acceptable to the government or to the defendant.

Shortly after May 17, 1955 the Collection Division began preparation of a memorandum recommending that defendant's tax liability be determined uncollectible. However, these preparations were thereafter suspended because the case had been referred to the Intelligence Division for investigation which resulted in the indictment returned herein January 14, 1957.

The defendant, beginning in 1955 made various payments on his 1953 income tax liability and on January 8, 1957 paid the unpaid balance in full, together with interest.

The government, in support of its contention presents substantially the following three arguments:

1. A factual comparison of this cause with the Palermo case;

2. Defendant since 1945 and up to and including 1955 followed a course of conduct evidencing not only a series of substantial defaults in payment of his taxes, but also deliberate and fraudulent evasion of internal revenue efforts at collection;

3. Defendant although having ample opportunity to pay his tax for the year 1953 (and prior years), affirmatively acted to escape payment.

As to the government's first argument, I have made a full factual comparison of the Palermo case with the cause now before me and find upon my analysis that this comparison does not support the government's contention that the defendant's failure to pay his 1953 income taxes at the time required by law was "willful".

The Court, in the Palermo case, reversed a judgment of conviction with regard to Count I which related to taxes due for the year 1953, and with respect to Count II which related to 1954 taxes, remanded the cause with instructions that a new trial be granted. At page 882 of 259 F.2d the Court stated:

"We are further of the opinion that the District Court erred in denying defendant's motion of acquittal with respect to Count 1 of the information. Count 1 charges the defendant with failure to pay $2,672 tax due for the year 1953 on or before March 15, 1954. In view of the defendant's payment in 1953 of $10,250 on account of prior years' taxes, and his substantial payments totaling in excess of $11,000 during the years 1948 to 1952, inclusive, it cannot be said that a finding of willfulness would have the requisite 'substantial' basis.

"(10) With respect to Count 2, relating to 1954 taxes and defendant's failure to pay them on or before the due date, April 15, 1955, the record discloses that he only paid $746 in 1954 on account of prior years and nothing in 1955. Whether the circumstances stated would be sufficient, together with his past record of failure to pay on time, to establish willfulness under proper legal standards at a new trial, may well merit the Government's consideration. However, we cannot now subscribe to defendant's contention

that an acquittal must be directed as to Count 2."

The Palermo case and the cause now before me are substantially similar in that both defendants were indicted for willful failure to pay income tax at the time required by law. Both defendants had in the years prior to the indictment years filed timely income tax returns but failed to pay the tax then due. Both defendants made full payment of income taxes for the years involved before the return of the indictments. It is true upon a comparative basis, that during the several years preceding each of the two indictments, Palermo, though apparently in debt, made substantially greater payments of his back taxes than Goodman. Palermo also may have been more desirous of paying his income taxes, as the government contends, since he vainly attempted to sell property that he owned in Atlantic City to pay his taxes and further offered this property and other property he owned in Philadelphia as security for his accumulated delinquent taxes. However, on the other hand, it is clear that Palermo had monies with which to pay his taxes during the times he defaulted in the payment of his taxes. For example, Palermo purchased a $25,000 home, two Cadillac automobiles, and arranged a $6,860 wedding for his daughter during the general period of his tax liability.

Though the defendant Goodman has earned large sums of money during the period of his tax liability and though he has borrowed money both against the cash surrender value of his life insurance policies and from relatives, friends and business acquaintances, and though the defendant during the period of his tax liability spent in excess of his total income for household and living purposes, family welfare and support of his two adult sons and the family of one of them, I cannot agree with the government's contention that these actions are comparable to the above purchases of Palermo. On the record before me, Goodman has been in a financial whirlpool of ever-increasing debt since 1938. On January 1, 1953, the liabilities of Goodman exceeded his liquid assets by approximately $31,105. On December 31, 1954, his liabilities exceeded his liquid assets by approximately $35,478. He lives in a rented apartment, does not own real estate, stocks, bonds or other investments, does not belong to any country clubs or like organizations and has not owned an automobile since prior to 1948. In short, the defendant Goodman, who has been in an insolvent condition for many years during the period of his tax liability cannot be compared to Palermo who obviously had not only money with which to pay his taxes but also enough to engage in luxury spending during the general period of his tax liability.

As to the government's second argument, I find that the defendant's course of conduct regarding defaults in the payment of his taxes and Internal Revenue efforts at collection during the years 1945 through 1955 is not proof of "willfulness".

It is true that the government used almost every method of collection available in its attempt to collect the tax liabilities of the defendant during the years 1943 through 1955. Every year is a history of many varied attempts and failures on the part of the government. It is also apparent from the evidence that defendant was not cooperative in many instances with government agents attempting to collect his taxes. It is also possible, as the government contends, that the defendant made trivial and unrealistic offers in compromise in order to suspend government efforts at collection. However, I find, after considering all the factors before me that the defaults in payment of taxes by the defendant as well as the frustrated efforts of the government to collect these taxes cannot support a finding of "willfulness" when viewed in light of the financial circumstances of the defendant. The pattern of the years 1943 through 1955 as here set forth by the government, in my opinion, describes a man who could not pay his taxes rather than a man who willfully failed to pay his taxes.

I now consider the government's third argument which bears upon and relates to its first two arguments.

It is the government's contention that the defendant's failure to pay his income tax liability for the year 1953 was "willful" because he had ample opportunity to pay his tax for the year 1953 and prior years and affirmatively acted to escape payment.

I have attempted to summarize, in substance, the government's arguments as follows:

(1) The defendant's law partners pleaded with him to pay his income taxes and offered to lend him money with which to pay his taxes or to allow him to make an assignment of fees during the later period of his tax liability;

(2) Because the defendant, at the insistence of his law partners who feared a tax levy on the law firm, contributed $11,303.62 between November 17, 1954 and January 13, 1955 to a trust fund in order to protect the members of the firm, he could have paid his income taxes for the year 1953 if he so desired;

(3) The defendant maintained a bank account under the name of his son, Leonard, also an attorney, for the admitted purpose of avoiding an Internal Revenue levy on his income, whereby the defendant would give Leonard funds for deposit and then the defendant would prepare lists of checks to issue which Leonard would then issue at the defendant's request. The checks that were issued were primarily for household expenses, insurance premiums, etc.;

(4) The defendant, despite his non-payment of income taxes had a credit rating which enabled him to borrow considerable sums of money; the defendant did not prefer the government as a creditor;

(5) Defendant in 1953 and 1954 turned over to the bookkeeper of defendant's law firm certain cashier's checks made out to the Director of Internal Revenue which in fact were delivered back to the defendant and used for other purposes;

(6) In 1951, the defendant received $1,708.79 by converting to his own use rents which belonged to the Trust of which the defendant was Trustee. As of June 28, 1960 this money was not repaid to the Trust;

(7) During 1955 and 1956, defendant's firm received a fee in the amount of $100,087.96 for services as co-counsel in the case of Pergament et al. v. Kaiser Fraser et al., 6 Cir., 224 F.2d 80. The government alleges that of this amount, Goodman received 30% but made no attempt to use any substantial portion of this fee to pay his taxes.

(8) Defendant was a lawyer, admitted to practice before the United States Treasury Department, with a thorough knowledge of internal revenue procedures;

(9) Since 1945, the defendant has followed a consistent program of divestment of assets and attachable income under circumstances which indicate that his purpose was to defeat tax collection. The government specifically refers to the following:

(a) Assignment of his life insurance in 1943 as security for a loan;

(b) Payment out of his income as fast as it was acquired during the period of his tax liability;

(c) Reconversion of funds set up for payment of taxes to his own personal and household uses;

(d) Contemplated death due to his age and a heart condition;

(e) His pyramided offers in compromise which act to suspend routine efforts at collection;

(f) The alleged statements of defendant:

"I am going to submit a new offer in compromise for less * * * since my income is less, I will submit one for less." (Markus, 3).

"If you levy on the partnership, I will dissolve the partnership overnight." (Markus, 3).

"I will not change my mode of living for the Government, or anyone else." (Markus, 4).

"Actually, a considerable portion of my cost of living should have been classified as entertainment expense incurred in obtaining income * * *." (Brugger, 2) Yet defendant's son stated: "The activities with respect to entertainment in our home were curtailed. In fact, the last large party that he gave that I could remember was on Pearl Harbor Day." (M. Leonard Goodman, 7–8).

"It is necessary that I live on a high standard of living in order to maintain the clientele I have." (Brugger, 3).

"I am quite confident my wife will be able to defend her right to my life insurance against any claims of the Government for unpaid income tax." (Brugger, 4).

"I am unable to furnish any financial statement further than what I have furnished. The offer in compromise I have made is the way I want it submitted." (Zasadil, 2).

"In filing an offer in compromise in 1953, I want the 1953 taxes to be included in it also. As for why I do not offer $15,000 cash and $400 a month in my offer in compromise, my answer is—the Collector out of courtesy to me ought to write me a letter answering my offer in compromise as I have submitted it. I will not talk with you further until I receive an answer in writing to my offer." (Wille, 2).

"I will not agree to an assignment of my insurance policies to the Government." (Trader, 13).

"I maintain a bank account under the name of my son for the purpose of avoiding an Internal Revenue levy on my income." (Sheehy, 4).

With regard to the government's first and fourth arguments, I think it obvious that there is no requirement that a person must borrow money or agree to an assignment of his fees in order to pay his income tax liabilities, nor is there any requirement that a person prefer the government as a creditor.

As to the government's second argument, it is apparent that the defendant was putting one-third of all monies received for the purposes of consummating an offer in compromise, paying part of his income tax liabilities and protecting his partners from financial loss in case of a government levy. It is quite possible, as the government contends, that, had the defendant taken similar measures earlier in the period of his tax liability, he might have been able to pay his income taxes. This contention does not, in my opinion, establish that the defendant's failure to pay his income tax for 1953 was "willful".

As to the government's third argument, it seems clear in view of the financial circumstances of the defendant and the use of monies so deposited, that he resorted to the use of his son's bank account in order to pay the necessaries of life after a levy had been placed on his own bank account.

As to the government's fifth and sixth arguments, it again appears that the financial circumstances of the defendant caused him to cash the checks intended as payment of his income tax liabilities and caused him to convert to his own use, the rents of the trust of which he was trustee. The defendant contends that the settlor, his brother, regarded the rent conversion as a loan and that he subsequently gave his brother a note for these monies.

As to the government's seventh argument, it appears from the testimony of Perlman and the defendant, that the defendant only received $16,800 which he had already borrowed monies against from other creditors. A further share of $3,047.23 was subsequently turned over to the Internal Revenue Service.

As to the government's eighth argument, the fact that Goodman was an attorney and licensed to practice before the United States Treasury Department, does not, in the cause before me, bear upon the issue of "willfulness".

As to the government's ninth argument, I have carefully considered those factors referred to by the government and find that they do not indicate a consistent program of divestment of assets and attachable income with a purpose of defeating tax collection. For the most part these circumstances reflect the defendant's financial insolvency. The alleged statements of the defendant are not, in my opinion, probative to the issue of "willfulness" in this cause. I find that the defendant did not have ample opportunity to pay his tax for the year 1953 and prior years and did not affirmatively act to escape payment of his tax liability in the sense that the government here contends. Accordingly, I find that the defendant's failure to pay his income tax liability for the year 1953 was not "willful" upon these grounds.

I have fully considered all the evidence before me including: the defendant's high expenditures for primarily household expenses when compared to his income; his defaults in his income tax liabilities from 1938 through 1954; and his conduct with regard to collection efforts on the part of the government throughout the general period of his liability. I have also considered on behalf of the defendant that: he, his wife and his son have been seriously ill during much of the period of his tax liability and that the defendant supported and cared for his father-in-law, who was also ill, until his death in 1954; and that he was perhaps motivated to higher expenses because of his position as a senior partner of his law firm which, on the record, represented several important clients.

I conclude that there is not before me, sufficient evidence to support a finding of "willfulness" especially in a case of this nature which falls within the shadow of imprisonment for debt.

Accordingly, I find the defendant not guilty.

The defendant may go hence without day.