UNITED STATES of America
v.
Robert E. GLASCOTT.
No. 11093.

United States Court of Appeals,
Seventh Circuit.

Nov. 4, 1954.

Campbell, Livingston, Teeple & Dildine, Fort Wayne, Ind., Olive, Knox & O'Hara, Indianapolis, Ind., Alexander Campbell, Fort Wayne, Ind., James G. Strawbridge, John H. O'Hara, Indianapolis, Ind., for defendant-appellant.

Jack C. Brown, U. S. Atty., Robert J. Wilson, Indianapolis, Ind., Stephen Leonard, Anderson, Ind., Don A. Tabbert, Indianapolis, Ind., Asst. U. S. Attys., for appellee.

Before MAJOR, LINDLEY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This appeal is from a judgment of the District Court entered on the verdict of a jury finding the defendant guilty of wilfully and knowingly attempting to defeat and evade payment of income tax due and owing by him and his wife to the United States for the years 1944, 1945, 1946 and 1947, by filing false and fraudulent joint income tax returns, on February 8, 1949, for the years 1944, 1945 and 1946, and on March 15, 1948, for the year 1947, all in violation of Sec. 145(b), title 26 U.S.C.A. The indictment consisted of one count for each taxable year. A verdict of guilty was returned on each count. Motions for acquittal and for a new trial were overruled and defendant was sentenced to serve six months on each count consecutively.

There was evidence on the trial, which, if believed, tended to prove the facts which we now set forth.

During and for many years prior to the taxable years in question, defendant was a practicing attorney in Michigan City, Indiana. During the years in question he received some rent from subtenants in his office space in addition to professional fees, interest on bank deposits and income from certain interests in partnerships and corporations. The tax returns which he made were upon a cash receipts basis.

During that part of the years here involved ending in March 1946, Elna R. Anderson, his regular secretary, was absent from the office and book records of cash receipts and expenditures used by defendant in making the returns for these four years were not kept, because of difficulty in obtaining competent help and the defendant's not being present to supervise the office activities. Upon her return, Mrs. Anderson began making entries in the cash books[1] and by 1948 had completed this work. She obtained the information for these entries from slips of paper or "memo" sheets given to her by the defendant. There was also what defendant called a client's ledger book[2], consisting of two volumes, as well as a trust book or ledger[3], which contained debit and credit entries, the latter representing amounts due to people whose money defendant held in trust. Defendant had a trust account at the bank. That account on December 31, 1947, had a balance of about $1,000, while a statement of the balances and the amounts due to persons, according to a statement prepared by defendant based upon the trust ledger, showed a balance due from defendant of some $17,-000. In 1949, defendant explained this situation to Robert A. Inglebright, an agent for the Bureau of Internal Revenue, by stating that the difference represented money which he had borrowed from the trust accounts and which was repayable thereto.

In May 1949, Inglebright went to defendant's office and inquired about his bookkeeping system. Defendant said that he had a cash receipt book which contained his taxable income and that he had expense accounts. When asked specifically if there was some kind of account cards, such as a ledger sheet on each account, or an accounts receivable ledger, he stated that there was none. Defendant turned the cash books over

to Inglebright, who examined and checked them against cancelled checks and bank statements. In response to another inquiry about an accounts receivable ledger, defendant stated he had no such record.

Later in the investigation, defendant turned over to Inglebright for inspection the trust ledger, which Inglebright analyzed. About a week after October 26, 1949, while Inglebright was working on the trust accounts, he visited defendant's office but did not find defendant there. There had been no previous arrangement with defendant with regard to making books available when he was absent. The agent asked for the trust ledger and the office girl telephoned to defendant. She thereupon handed to Inglebright a black ledger book which closely resembled the trust ledger with which he had been working. It was not the trust ledger, but was a ledger with each page showing an account of a client. It appeared to cover accounts alphabetically from "M" to "Z." He inquired of the girl whether or not there was another book containing "A" through "L." She said that there was and she produced it. It had a gray binder. Thereafter defendant appeared and, indicating the two books which had been handed to Inglebright, stated that those were not the books he wanted—that he wanted the trust ledger. When asked whether these were not accounts receivables, defendant stated that they were, that they were the records of the accounts of clients, and that they could be accounts receivable records. He answered in the affirmative when asked whether the credit entries in these two books represented receipts from his clients. He permitted Inglebright to take the two books in order to determine the credits therein.

When Inglebright returned the accounts receivable ledgers he pointed out

---

1. As in the record, these books are sometimes referred to in this opinion as "cash journals," "cash receipts journals," "cash receipt book," "journals" and "cash books."

2. Sometimes referred to in the record and in this opinion as "accounts receivable book," and "accounts receivable ledger."

3. This record was not introduced in evidence.

to defendant a substantial difference among the credit entries in these ledgers, the cash receipts entered in the cash books and the amounts deposited in the bank account. When Inglebright inquired whether the credit postings in these ledgers were for payments by clients for services rendered, defendant answered that they were and should be included as taxable income. After analyzing the accounts receivable ledgers. Inglebright asked defendant to submit to a question and answer statement under oath "for the purpose of obtaining his explanation of the records which had not been presented * * * at the time of the first statement." Defendant replied that, upon advice of legal counsel, he would make "no further statement under oath."

An analysis of the credit postings in the accounts receivable ledgers, when compared with the cash book and tax returns, showed discrepancies for each of the years in question. Both the cash book and the returns set forth a less amount of income than that shown on the accounts receivable ledgers.

Based upon all of the records submitted to Inglebright, the balances of unreported professional income were: for 1944, $8,516.17; for 1945, $11,674.69; for 1946, $12,582.90, and for 1947, $10,257.27. There were total fees deposited in the checking and saving accounts of defendant which were not recorded in either the accounts receivable ledgers or the cash receipts journals, amounting to $2,441.41 in 1944, $2,462.00 in 1945, $1,849.97 in 1946 and $1,018.13 in 1947.

In December 1948, defendant filed a written application for admission to practice before the Treasury Department. A letter was written to defendant asking whether he had filed returns for 1945 and 1946, and, if not, his reasons for not doing so. In response thereto defendant wrote under date of February 3, 1949, that all of his returns had then been filed [4] and the tax paid thereon. The letter stated that the reason for the late filing was "simply my inability to make payment at the time the tax was due, but I have been fortunate enough to arrange a loan to get the matter cleared up."

Defendant's checking account showed deposits for the year 1944 in the sum of $13,261.50, in 1945 in the sum of $23,767.01, in 1946 in the sum of $31,441.76 and during 1947 in the sum of $32,630.56. His savings account showed deposits in 1944 in the sum of $3,194.73, during 1945 in the sum of $2,195.29, in 1946 in the sum of $1,427.07 and in the year 1947 in the sum of $476.14. Interest on the deposits in the savings account for 1946 was $146.57 and in 1947 was $167.39. This interest was not reported on the returns for these two years and defendant agreed with the agent that such interest should have been reported.

The balance in the checking account on March 15, 1945 was $1,027.64 and in the savings account $8,337.44. The balance in the checking account on March 15, 1946 was $879.63 and in the savings account $10,373.29. The balance in the checking account on March 15, 1947 was $1,405.12 and in the savings account $11,794.53.

There were the following expenses for which defendant took credit on his returns, for which he was subsequently reimbursed and which reimbursement did not appear upon the returns as income: $41.60 in 1944, $1,043.16 in 1945, $729.56 in 1946 and $476.22 in 1947. Defendant admitted that such items should have been on the return as income.

The returns for these four years were prepared by an accountant named Mathias upon information received by him from defendant. Mathias made no audit of the records.

There was also evidence, which if believed, tended to prove the facts set forth below.

4. The 1944, 1945, and 1946 returns were actually filed on February 8, 1949, and the 1947 return was filed on March 15, 1948.

During the absence of Elna R. Anderson, defendant's office was in a continual state of confusion because of lack of secretarial help; he had numerous high school girls for short periods of time; the files were improperly maintained or not maintained at all. Defendant testified that he gave Inglebright all of the records which were introduced at the trial.

During a part of the years 1946 and 1947 defendant was not present in his office at all, due to ill health. In 1944 the defendant began a gradual decline in health, which, in 1947, resulted in a coronary attack. In October of that year he required medical treatment. This condition continued through the trial.

There was also evidence given by defendant's family physician that he could not say whether this condition of the defendant had any effect upon his mind insofar as his ability to practice law was concerned, and that defendant "was perfectly poised on every examination." A defense witness who testified that he obtained the services of a physician for defendant in March 1948, while on a trip to Florida with defendant, stated that he "considered defendant as sharp and astute mentally as he was before."

1. It is not denied that defendant had unreported taxable income in 1944, 1945, 1946 and 1947. He contends, however, that the evidence does not prove wilfulness or intent to understate his income, which is an essential ingredient of the statute [5].

■ The key word in this statute is "wilful." It is an essential ingredient of the crime. Wilful is distinguished from accidental. Under this statute that which is wilful is an actual, intentional wrong doing with the purpose of evading the tax. It is not established by negligence, however gross. Wilfulness is a subjective state in most instances. This subjective state, of course, may be shown to exist by various statements and conduct.

In Spies v. United States, 317 U.S. 492, at page 499, 63 S.Ct. 364, at page 368, the court said:

"By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."

■ In the case at bar, whether or not the evidence justified a conclusion that the admitted understatements of income were due to wilfulness was a question for the jury. Implicit in their verdict of guilty is a finding of wilfulness. There was evidence to sustain this finding. When asked by Inglebright to produce all of his records defendant withheld his accounts receivable ledgers. Upon at least two occasions he was asked specifically if he had any accounts receivable books or ledgers and his answers were in the negative. Quite by inadvertance Inglebright came into possession of these ledgers. When confronted with that fact, defendant admitted their existence for the first time and when pressed for an explanation under oath as to why there was a discrepancy between those ledgers and records voluntarily submitted, he refused such a statement upon advice from counsel.

5. Sec. 145(b), title 26 U.S.C.A., which reads, in part: " * * * any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution." See Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

The cash receipts journals were made up long after the receipts of the monies therein shown. They were made by Mrs. Anderson from memoranda on slips of paper handed to her by defendant. The totals so entered were gross understatements of the totals appearing in the accounts receivable ledgers.

The jury had before it for consideration the evidence by which defendant sought to explain his incorrect returns.

Significant facts which the jury could have found on the evidence submitted were: a gross discrepancy between the income reported and the income received, defendant's groundless excuse of financial inability to make payment of his taxes when due, the experience and education implicit in his status of a lawyer, his training in income tax matters, which convinced him that he was qualified to practice before the Treasury Department, and his purposeful withholding from Inglebright of his accounts receivable ledgers. The jury might reasonably have then concluded that these facts were badges of fraud which established beyond a reasonable doubt that defendant's understatement of his income was a wilful attempt to evade or defeat his income tax.

There is substantial evidence in the record to support the findings of the jury and neither the trial judge nor this court has a right to disturb that verdict.

█ 2. Inglebright testified in direct examination by government counsel in regard to the fact that defendant's balance in his trust account at the bank on December 31, 1947, was about $1,000 and that his trust account ledger showed that he owed a balance on trust accounts totalling about $17,000. When he asked defendant about this situation, he was told that the deficit represented money which defendant had borrowed from trust accounts. At the time of this conversation defendant was concealing from Inglebright the existence of the accounts receivable ledgers. He had turned over to Inglebright the trust ledger. Thus handicapped, Inglebright was attempting to ascertain defendant's income. While the discrepancy between the trust ledger and the trust bank account actually had no bearing upon the amount of defendant's income, it was a natural subject of conversation between the two men and was not a foreign subject intentionally interjected by the government. There was no objection by defense counsel to the foregoing evidence. Then, without any question to him, Inglebright volunteered "we discussed the effect that might come up as a result of a prosecution and I asked what would happen if the newspapers carried a headline to the effect that prominent local attorney had been prosecuted." Defense counsel stated that his answer was highly prejudicial, irrelevant, improper and immaterial. He made no motion of any kind.

Thereupon the court indicated that the last statement by the witness was not proper and that it was prejudicial and could be "inflammable as far as the jury's mind is concerned." The court thereupon instructed the jury to disregard the conversation of the witness with the defendant regarding a newspaper headline and that the jury should disregard the last remark. The court also remarked that the other evidence was admissible and that he believed "the cases hold that evidence of commission of other crimes in connection with tax matters is admissible to show intent," though he wanted the jury "to understand that the court is not inferring that any other crime was committed."

█ Evidently, counsel for both sides were satisfied with this instruction. In any event, defense counsel offered no objection to it and made no motion in regard thereto. In this state of the record, defendant is in no position to complain in this court. The manner in which the court attempted to eradicate the effect, if any, of the volunteered statement of the witness was not excepted to in any way. We do not think that this incident in any way affected

the substantial rights of the defendant. From an examination of the entire record, we believe that substantial prejudice does not appear and that, if this be error, it must be regarded as harmless. Berger v. United States, 295 U.S. 78 at page 82, 55 S.Ct. 629, 79 L.Ed. 1314.

For reasons hereinbefore set forth, the judgment of the District Court is

Affirmed.