ARLINGTON S. PHILLIPS FUNERAL HOME, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Arlington S. Phillips Funeral Home, Inc. v. Commissioner
Docket No. 10375-77.
United States Tax Court
T.C. Memo 1980-394; 1980 Tax Ct. Memo LEXIS 189; 40 T.C.M. (CCH) 1261; T.C.M. (RIA) 80394; September 17, 1980, Filed *189 Petitioner understated income for fiscal years ended April 30, 1973 and 1974. Petitioner's major shareholders were Arlington Phillips and Ethel Purdie. Held: Petitioner is liable for the sec. 6653(b) I.R.C. 1954, addition to tax. Jacques T. Schlenger and Harry D. Shapiro, for the petitioner. Daniel J. Wiles, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By letter dated July 15, 1977 respondent determined deficiencies in petitioner's income taxes and additions to tax under section 6653(b), I.R.C. 1954, for the taxable years and in the amounts set forth *190 below: Fiscal Year
Sec. 6653(b)
Ended April 30,
Deficiency
Addition to Tax
1973
$22,556.96
$11,278.48
1974
53,625.76
26,812.88
After concessions by both parties the only issue remaining is the addition to tax for fraudulent underpayment. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Arlington S. Phillips Funeral Home, Inc., petitioner, during the years in issue was a corporation chartered under the laws of the state of Maryland with its principal place of business located in Baltimore, Maryland. Petitioner, a cash-basis taxpayer, filed corporate income tax returns for the taxable periods ended April 30, 1973 and 1974 with the Internal Revenue Service Center, Philadelphia, Pennsylvania. At the direction of Mr. Phillips, the returns were signed by Ethel Purdie, petitioner's secretary/treasurer, and were prepared by Albert A. Rosenstadt, the petitioner's accountant. Mr. Rosenstadt had prepared all the corporate tax returns of petitioner since it became known in 1967 as Arlington S. Phillips Funeral Home, Inc. Petitioner *191 at all times here relevant was engaged in the business of operating a funeral home. All of the issued and outstanding stock of Earl B. Wolverton Funeral Home, Inc., the predecessor corporation to petitioner, was purchased by Arlington S. Phillips in 1967. During the years in issue, Mr. Phillips was the president of petitioner; Gwendolyn Purdie Williams, the vice-president; and Ethel Purdie, the secretary/treasurer. During the years in issue, petitioner, Mr. Phillips and Mrs. Purdie were all represented in legal matters by Charles P. Howard. Mr. Howard has no affiliation with the law firm which petitioner retained in 1977 to represent it in this proceeding. In November 1972, a formal meeting of the "stockholders and members" of petitioner was called for the issuance of stock certificates and the election of officers. At that time stock certificates were issued to Mr. Phillips, Mrs. Purdie and Gwendolyn Purdie Williams. The stock certificates were executed, in the presence of Mr. Howard, by Mr. Phillips as president and Mrs. Purdie as secretary/treasurer. From November 1972, and for the remainder of the period in issue, the stockholders of petitioner were as follows: No. of shares
% of ownership
Arlington S. Phillips
1,942
51.8
Ethel Purdie
1,800
48.0
Gwendolyn Purdie Williams
5
.2
*192 The signatures of Mr. Phillips on the stock certificates all contained known variations of his signature and were written rapidly and naturally. The degree of similarity of signatures on these certificates is within the normal consistency and variation of Mr. Phillips' writing. Mrs. Purdie maintained a residence on Mohawk Avenue during the years in issue. Although Mr. Phillips maintained a separate residence on North Monroe Street, approximately one-half block away from petitioner's principal place of business, he regularly stayed at Mrs. Purdie's Mohawk Avenue residence prior to 1975. After 1975 Mr. Phillips did not frequent the Mohawk Avenue residence as often. Although Mr. Phillips was married, he maintained a relationship with Ethel Purdie sufficiently close to result in the birth of their daughter, Gwendolyn Purdie, in 1948. Gwendolyn Purdie was employed by petitioner on a part-time basis from 1964 through 1967 and on a full-time basis from February of 1971 until July of 1976. Gwendolyn Purdie's duties were primarily prescribed by her mother and father, and included arranging funerals and recording receipts on the bills retained by the funeral home. On May 9, 1970 Gwendolyn *193 Purdie married Robert Williams. Mr. Williams was employed by petitioner from January of 1972 through March of 1974. Mrs. Purdie had a son, Lyles Purdie, Jr., who is not related to Mr. Phillips. Mr. Purdie was a icensed funeral home director and was employed sporadically by petitioner during the period from 1971 through 1975. Mr. Purdie was eventually discharged by Mr. Phillips. Except for brief absences, Ethel Purdie was employed by petitioner as its office manager and bookkeeper from 1955 until September 15, 1978. Mrs. Purdie was responsible for noting receipts on the customers' bills and posting all receipts in petitioner's general ledger. Petitioner maintained a very informal, if not lax, system of bookkeeping and accounting. The method of bookkeeping and accounting remained the same during the period 1971 through 1975. Upon completion of a funeral, petitioner prepared for each customer a bill which listed the charges for services rendered and items sold. Copies of the itemized bill would be retained by petitioner in a separate folder maintained for each customer for whom petitioner performed a service. Upon receipt of partial or total payment from a customer, the *194 copy of the customer's bill retained by petitioner would be pulled. The amount paid, the date of payment, and the new balance would be noted on the bill retained by petitioner. A copy of the revised bill would be given to the customer as a receipt. Petitioner conducted some 200-275 funerals per year on the average. Funeral folders generally would not be created for removals as opposed to burials. Removals are services where the funeral home would take possession of a corpus, embalm it and them ship it to another funeral home (generally out of state) for burial. These removals generally resulted in small fees of $300-$400. Generally payment for these removal services would be converted to cash and would neither appear on the general ledger nor be subsequently deposited in the corporate checking account. In contrast, when checks were received by petitioner in payment for funeral services, they would either be deposited to the corporate checking account or cashed at the election of Mr. Phillips or Mrs. Purdie. The corporate checking was maintained at Maryland National Bank. Mr. Phillips and Mrs. Purdie were authorized signatories of the account. In addition, Mr. Phillips and *195 Mrs. Purdie maintained a joint personal checking account at Maryland National Bank. If the petitioner did not deposit the cash or checks the day received, the payment would be taken by either Mr. Phillips or Mrs. Purdie to the Mohawk Avenue residence. There, the receipts were placed in a cedar closet in the basement of that residence. Much of this money would be returned to the funeral home. The receipts returned would then be recorded on the general ledger by Mrs. Purdie. At the same time the receipts were marked on deposit slips and the money deposited in the corporate checking account. As a general rule checks would be returned to the funeral home. However, often cash was not returned or subsequently deposited. The amount remaining at Mohawk Avenue was thousands of dollars and amounted to $10,000 at times. In January 1975 the amount was at least $30,000. The cash that was not returned to the corporation was not accounted for on the general ledger that went to the accountant. Petitioner's general ledger consisted of a loose-leaf notebook containing the amounts and dates of payment of petitioner's receipts for each month and the name of the decedent on whose behalf the payment *196 was made. The general ledger, cancelled checks, check stubs and monthly bank statements of petitioner were transmitted by Mrs. Purdie to Mr. Rosenstadt.This information was the primary source from which the accountant prepared petitioner's annual financial statements and its income tax returns. Mr. Phillips and Mrs. Purdie knew that the accountant compared the bank deposits with the general ledger sheets in filling out the corporate income tax return. Prior to and during the years in issue, Arlington Phillips suffered from hypertension and took medication to alleviate his condition. In June of 1971 Mr. Phillips suffered a stroke. The stroke occurred in the left hemisphere of Mr. Phillips' brain causing partial paralysis of the right side of his body. During the initial recuperation period, approximately six months, Mr. Phillips maintained involvement with petitioner's business by way of telephone. Thereafter, Mr. Phillips increased his involvement with petitioner's business operation to the point where he would visit the petitioner's principal place of business, work until he got tired, and then return to his house that was only a half-block away. In 1974 Robert Williams, *197 after separating from Mrs. Williams and being discharged by Arlington Phillips, informed respondent that petitioner was not reporting all of its taxable income on its tax returns. The matter was referred to the Intelligence Division of respondent which initiated an investigation of petitioner. In June 1975, respondent served a summons on petitioner which requested petitioner to supply all of its books and records for the years at issue and requested that an officer of the corporation appear at the Baltimore office of respondent to answer, under oath, questions posed by special agents of respondent's Intelligence Division. A similar summons was served on Mr. Rosenstadt. On June 19, 1975 Mr. Phillips appeared at respondent's Baltimore office with his attorney, Mr. Howard. On August 28, 1975 Mrs. Purdie, also accompanied by Mr. Howard, was interviewed by special agents at respondent's Baltimore office. Mr. Phillips and Mrs. Purdie each stated, during their respective sworn interrogations, that the records of petitioner for transactions occurring prior to 1975 had been destroyed. A subsequent disclosure of the existence of such records proved that both statements were inaccurate. *198 Both Mr. Phillips and Mrs. Purdie knew, at the time of their respective interrogations, that records of petitioner which had been requested by respondent did, in fact, exist. They also knew the location of such records. Further, Mr. Phillips represented that all the receipts of the corporation were deposited in the corporate checking account. This statement was made in June 1975, six months after he had removed $30,000 of corporate funds from the Mohawk Avenue residence and deposited it in his personal savings account. Other avenues of ascertaining the proper income of petitioner were attempted by respondent, including summoning bank records (which were incomplete) and surveying customers of petitioner, as shown by state death certificates, during the years at issue. The information gathered by respondent proved insufficient to make out a criminal case and the respondent then terminated its investigation of petitioner. Sufficient evidence was adduced upon which respondent could estimate petitioner's gross receipts for the years at issue and this information is the basis upon which the statutory notice was issued. OPINION Due to concession and stipulation as to the fact, *199 and amount, of underpayment of tax, the only issue remaining for our determination is whether any portion of the underpayment of tax during the years in issue is due to fraud within the meaning of section 6653(b). [1] The burden is upon respondent to show, by clear and convincing evidence, that some part of the conceded underpayment for each of the years at issue was due to fraud.Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The question is one of fact. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962). Petitioner concedes that it *200 failed to report a substantial amount of its income for the taxable years at issue. Petitioner agrees with respondent that Mrs. Purdie diverted petitioner's receipts to the cedar-lined closet in her residence. Petitioner concedes that Mrs. Purdie failed to deposit a substantial amount of petitioner's income in petitioner's checking account.Petitioner concedes that Mrs. Purdie failed to report all of petitioner's income on the books and records, which were supplied to petitioner's accountant for the preparation of its income tax returns. Petitioner concedes that, as a result of such failure, Mrs. Purdie knowingly and willfully caused petitioner to understate substantially its taxable income for the years at issue. Further, the record establishes that Mrs. Purdie was a director and officer of the corporation and that she was authorized, as well as directed by Mr. Phillips, to sign the corporate returns. Under these facts it would appear that the respondent has established a prima facie case of fraudulent underpayment and that petitioner would be liable for the section 6653(b) addition to tax. Crescent Mfg. Co. v. Commissioner, 181 F.2d 185 (6th Cir. 1950), affg. *201 per curiam a Memorandum Opinion of this Court. Petitioner, however, contends that Mrs. Purdie filed the corporate returns to cover up her embezzlement of corporate funds, and that her actions were not done "in behalf of, but against the interest of, the corporation." See Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 235 (3d Cir. 1967) reversing 46 T.C. 622 (1966) and Botwinik Brothers of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). Therefore, petitioner argues that one of the elements necessary to impute the corporate officer's actions to the corporation (fraud for the benefit of the corporation) is lacking and accordingly respondent failed to carry his burden of proof. We do not agree. In support of its position, petitioner contends that no shareholder benefited from the fraud because Mrs. Purdie was not a shareholder of the corporation. Both parties put on expert witnesses with respect to the authenticity of the signature on stock certificates purportedly owned by Mrs. Purdie. By petitioner's own admission, respondent's expert witnesses sounded more "technically compelling." Further, Mr. Howard, petitioner's *202 attorney, stated that he was at the meeting at which stock certificates were issued to Mrs. Purdie and Mrs. Williams. We find that Mrs. Purdie was a shareholder of petitioner. The relationship between Mrs. Purdie and Mr. Phillips further supports a finding that Mr. Phillips was not an "innocent shareholder." At least some of the unreported income was kept at the Mohawk Avenue residence, for all practical purposes the home of Mr. Phillips and Mrs. Purdie prior to and during the years in issue. Both Mrs. Purdie and Mr. Phillips had keys to and control of this property, and Mr. Phillips considered it his property. He directed and paid for major improvements to the property, including a security system, a new kitchen and central air-conditioning. Further Mrs. Purdie and Mr. Phillips maintained a joint checking account. According to petitioner's witnesses, the Mohawk Avenue residence was expensively furnished and Mrs. Purdie owned at least two fur coats and valuable jewelry.In addition, she and Mr. Phillips had purchased a Mercedes Benz sports car for their daughter, Mrs. Williams. Neither party has contended that Mrs. Purdie's salary would have allowed her to maintain this standard *203 of living. We cannot accept the argument that Mr. Phillips, an admitted shareholder, was unaware of the unreported income, or that petitioner did not benefit therefrom. Viewed in this light the facts establish that two shareholders, who together owned over 99 percent of the stock of petitioner, were utilizing the unreported income for their own benefit. "In the case of sole or dominant stockholder-officers who divert corporate funds for their own benefit, such action is not regarded antagonistic to the corporation, since such stockholders to a large extent are merely 'taking their own money' * * * and thus obtaining from the corporation what would otherwise be available to them as dividends." Botwinik Brothers of Mass., Inc. v. Commissioner, supra at 996. Mr. Phillips' participation in the attempt to cover up the underreporting of income further evidences his knowledge thereof. When Mr. Phillips appeared on behalf of petitioner, with petitioner's counsel, he knowingly misrepresented under oath to respondent that the records of petitioner had been destroyed. Further, Mr. Phillips misled the investigators by stating that all the receipts of petitioner were *204 deposited in the corporate checking account. This statement was made by Mr. Phillips after he had removed over $30,000 of corporate funds from the Mohawk Avenue residence and had deposited it into his personal savings account. Misleading statements are a strong indication of fraud on the part of the spokesman. McManus v. Commissioner, T.C. Memo 1972-200, affd. 486 F.2d 1399 (4th Cir. 1973). When the false statement is that relevant records do not exist, such statement evidences an intent to evade taxes. United States v. Wilkins, 385 F.2d 465 (4th Cir. 1967), cert. denied 390 U.S. 951 (1968). United States v. Glascott, 216 F.2d 487, 491 (7th Cir. 1954), cert. denied 348 U.S. 937 (1955). Our above finding should not be interpreted as a finding that Mr. Phillips orchestrated the fraudulent underpayment of taxes. We do not necessarily contest petitioner's contention that Mr. Phillips was dominated, at least in part, by Mrs. Purdie. Reaching the total truth in the instant case was made difficult by the inter-family relationships that existed. No eulogies are in order for the candor of any of *205 the nonexpert witnesses. The witnesses' testimony was conflicting and, in almost every case, did not appear to be totally truthful and in every case appeared to be biased in one direction or another. The question is whether we are satisfied, by clear and convincing evidence, that at least some portion of the conceded deficiencies for the years at issue were attributable to fraud by petitioner. We are so satisfied, and accordingly we sustain respondent's application of the section 6653(b) addition to tax. Decision will be entered under Rule 155. Footnotes
1. Sec. 6653(b) reads as follows: Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩