GEORGE T. KATTAR AND PHYLLIS A. KATTAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; THE PITTSBURGH CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kattar v. Commissioner
Docket Nos. 2800-74, 2040-75, 4567-75.
United States Tax Court
T.C. Memo 1984-387; 1984 Tax Ct. Memo LEXIS 288; 48 T.C.M. (CCH) 629; T.C.M. (RIA) 84387; July 26, 1984. Jerome E. Rosen, for the petitioners. Barry J. Laterman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in Federal income tax and additions to the tax in these consolidated cases as follows: Docket No. 4567-75 - Petitioners George T. and Phyllis A. Kattar
Addition to Tax
Sec. 6653(b)
Year
Deficiency
I.R.C. 1954
1963
$12,393.77
$6,196.88
1964
19,382.86
9,691.43
1965
38,309.03
19,154.53
1966
38,453.95
19,226.97
1967
35,290.76
17,645.38
1968
97,766.66
48,883.33
*290 Docket No. 2800-74 - Petitioners George T. and Phyllis A. Kattar
Addition to Tax
Sec. 6653(a)
Year
Deficiency
I.R.C. 1954
1970
$26,165.57
$1,308.28
Docket No. 2040-75 - the Pittsburgh Corporation
Year
Deficiency
Taxable year
ended 3/31/63
$28,514
The issues for decision are: (1) Whether petitioners George T. Kattar and Phyllis A. Kattar had unreported income in the amounts of $32,505.20, $62,372.92, $96,931.70, $69,493.53, $99,229.56, and $152,939.38 in the years 1963 through 1968, respectively, as determined by respondent using the net worth plus personal expenditures method of income reconstruction; (2) Whether, if we find that petitioners had unreported income, petitioners' returns for those years were "fraudulent" under section 6501(c)(1); [1] and (3) Whether any part of the underpayment of taxes for any of the years at issue, 1963 through 1968, was due to fraud under section 6653(b). FINDINGS OF FACT George T. Kattar *291 (Kattar) and Phyllis A. Kattar (Mrs. Kattar), petitioners in Docket Nos. 2800-74 and 4567-75, are husband and wife. At the time their petitions were filed, they resided in Meredith Neck, New Hampshire. They filed joint Federal income tax returns for 1963 through 1968, the years in issue, with the Internal Revenue Service Center, Andover, Massachusetts. During those years, the Kattars had 7 dependent children. The Pittsburgh Corporation (Pittburgh), petitioner in Docket No. 2040-745, is a corporation formed under the laws of Massachusetts on or about July 9, 1963. At the time its petition was filed, Pittsburgh's principal office was located in Lawrence, Massachusetts. 1. Corporations and Other Entities With Which Kattar was Involved
During the years at issue, Kattar was a paid financial consultant; in that capacity, he realized substantial income from finders fees and commissions. At all times relevant to this case, Kattar was employed as president, treasurer and/or chief operating officer of all of the following corporations and other business entities: 1. Pittsburgh Corporation. Kattar owned all of Pittsburgh's issued and outstanding stock. 2. Tri-State Development *292 Corporation (Tri-State), a Delaware corporation formed in 1964. During the years at issue, Kattar owned 70 percent or more of Tri-State's issued and outstanding stock. Tri-State was the 100 percent shareholder of the following corporations: a. New Hampshire Island Development Association, Inc. b. Second Presidential Corporation c. Castle Shores, Inc. d.Gunstock Acres, Inc. e. Gunstock Development Corporation f. Gunstock Sales Corporation g. Gunstock Acres Association, Inc. h. Sebago Estates, Inc. i. American Heritage Properties, Inc. (a Maine corp.) j. American Haritage Properties, Inc. (a Mass. Corp.) k. First Lowell Realty Corporation The principal business activities of Tri-State and its 11 subsidiaries were: (1) the acquisition of land for development; and/or (2) realty development. 3. Community Investment Corporation (Community), a Massachusetts corporation formed in 1959. Community was the 100 percent shareholder of the following corporations: a. Community Finance, Inc. of Lawrence b. Community Finance of New Hampshire, Inc.
c. Merrimack Valley Company
d. American Investment Corp. e. Community Finance, Inc. of Newburyport
*293 f. Mass. Premium Finance Co., Inc. The principal business activity of Community and its 6 subsidiaries was making loans and investments. Community's income was derived from management fees and dividends from its subsidiaries. 4. Seabreeze, Inc. 5. Northeast Investment Co., Inc. 6.North American Enterprises, Inc. 7. Kattar Realty Trust 8. North American Credit Corporation 9 Merrimack Valley Capital Corporation
10. Salem Investment Corporation 11. Essex Investment Corporation Kattar was the sole stockholder or beneficial owner of the entities numbered 5 through 11 above. The records of at least 15 of the entities identified above were kept at one location in Salem, New Hampshire, where Kattar maintained an office. Kattar was the designated signatory on checking accounts maintained by at least 16 of the entities. Kattar did not maintain a checking account in his own name until 1966. During the years at issue, Kattar used the checks of his owned or controlled corporations to pay his personal expenses as a matter of convenience as one uses an American Express card. For example, mortgage payments on the Kattar's home on Jackson Street, Methuen, *294 Massachusetts, were made by Tri-State, Community, Northeast Investment Co., Inc., and North American Credit Corp. In addition, the purchase price and nearly all the expenses of maintaining the property known as "Clovelly", the Kattar's seven bedroom, three story summer residence located on Lake Winnepesaukee in New Hampshire, were paid by Kattar Realty Trust and then charged to Kattar's personal account. During the years 1963 through 1968, Kattar's owned or controlled corporations disbursed funds to or for his benefit in the respective amounts of $53,460.09, $50,512.44, $78,406.71, $101.021.72, $63,959.04, and $89,188.68. Kattar would reimburse his owned or controlled corporations for some of the amounts paid out to him on his behalf from his own funds. All amounts paid out to Kattar or on his behalf by his owned or controlled corporations and amounts paid by Kattar into or on behalf of his owned or controlled entities were reflected on a "Due to/Due from" account, maintained for each entity by Kattar's accountant, Seymour Yellin, C.P.A. (Yellin). The following is a summary of the yearend balances of Kattar's "Due to/Due from" accounts as reflected on the books of his owned *295 or controlled corporations. The positive totals represent amounts owed by the corporations to Kattar; the totals in parentheses represent amounts owed by Kattar to the corporations. Summary Schedule
Kattar's "Due to/Due from" Accounts
Balances at December 31
Related
Corporation
1962
1963
1964
1965
Castle Shores,
Inc.
Community Finance
Inc. of
Lawrence
(500.00)
(500.00)
(500.00)
(740.00)
Community Investment
Corp.
(2,000.00)
(30,950.00)
(14,500.00)
(13,024.00)
First Lowell
Realth Corp.
Gunstock
Acres, Inc.
13,241.91 16,247.91 Kattar
Realty Trust
(2,000.00)
9,138.60 (6,231.68)
(17,342.04)
Merrimack
Valley Capital
Corp.
(500.00)
(500.00)
New Hampshire
Island Development
Assn.
North American
Credit Corp.
North American
Enterprises
18,641.00 (22,918.75)
(26,422.43)
(5,384.09)
Northeast Investment
Co.
(8,573.51)
8,894.48 2,005.85 10,898.67 Pittsburgh
Corp.
300.00 21,200.00 Salem Investment
Corp.
4,500.00 4,000.00 3,850.00 3,850.00 The Second
Presidential
Corp.
Tri-State
Development
Corp.
21,473.30 23,320.56 TOTALS
$10,067.49 ($32,335.67)
($7,283.05)
$38,527.01 *296 Related
Corporation
1966
1967
1968
Castle Shores,
Inc.
($20,000.00)
($10,000.00)
Community Finance
Inc. of
Lawrence
(740.00)
(740.00)
(537.00)
Community Investment
Corp.
(10,723.00)
241.38 (4,087.57)
First Lowell
Realty Corp.
(7,000.00)
Gunstock
Acres, Inc.
20,747.91 15,646.13 (89.85)
Kattar
Realty Trust
(25,809.04)
(39,411.10)
(39,739.75)
Merrimack
Valley Capital
Corp.
500.00 500.00 500.00 New Hampshire
Island Development
Assn.
10,500.00 10,500.00 North American
Credit Corp.
(2,522.88)
(4,782.30)
5,902.98)
North American
Enterprises
(7,944.60)
(19,105.93)
(18,193.65)
Northeast Investment
Co.
34,066.59 29,177.82 39,685.23 Pittsburgh
Corp.
21,200.00 21,200.00 21,200.00 Salem Investment
Corp.
3,850.00 3,850.00 3,850.00 The Second
Presidential
Corp.
8,500.00 8,500.00 Tri-State
Development
Corp.
8,192.56 117,453.77 109,903.77 TOTALS
$31,317.54 $133,029.77 $108,088.20 Yellin was the accountant for Kattar individually and for all of his owned and controlled corporations during the years at issue. He prepared Federal income tax *297 returns for those years for the Kattars and for the related corporations. In preparing the returns, Yellin relied on the information supplied by Kattar's own bookkeeping employees. In their Federal income tax returns for the years 1963 through 1968, the Kattars reported gross income and taxable income as follows: Year
Gross Income
Taxable Income
1963
$12,448
$5,403
1964
24,638
14,738
1965
14,450
1,071
1966
15,300
4,886
1967
17,879
10,511
1968
54,655
38,956
In a personal financial statement filed by Kattar on August 23, 1963, with Laconia Savings Bank, Kattar stated that he had income of $35,000 in 1963. On November 1, 1963, Kattar filed an application for a mortgage loan with Plymouth Guaranty Savings Bank which reflects income of $30,000 in 1963. 2. Respondent's Net Worth Computation
Respondent reconstructed petitioners' taxable income for the years 1963 through 1968 using the net worth plus personal expenditures method as follows: Taxable Year Ending December 31, 1962 through December 31, 1968
Net Worth Computation
Assets
1962
1963
1964
1965
1.Cash in Banks
$ 108.00  6,129.76
2. George T. Kattar's
Due To/From
Accounted-related
10,067.49
(32,335.67)
7,283.05)
38,527.01
3. Real Estate
38,000.00
101,145.36 149,149.61 90,355.26
4. Investments
64,150.00
79,343.00 85,343.00 86,843.00
5. Notes and Loans
Receivable
1,000.00
6. Other Assets
165,733.16 181,519.62 30,109.93
Total Assets
$113,217.49
$313,885.85 $408,837.18 $251,964.96
Liabilities
Loans Payable
$ 22,000.00
$197,494.76 $202,035.64 $ 73,576.52
Mortgages Payable
24,802.82
57,316.67 110,283.89 45,875.95
Total Liabilities
$ 46,802.82
$254,811.43 $312,319.53 $119,452.47
Net Worth
$ 66,414.67
$ 59,074.42 $ 96,517.65 $132,512.49
*298 Assets
1966
1967
1968
1. Cash in Banks
$ 6,401.72 6,495.22
$ 12,031.63
2. George T. Katter's
Due To/From
Accounted-Related
31,317.54
132,969.77
108,088.20
3. Real Estate
99,512.08
96,780.82
183,276.27
4. Investments
108,316.00
161,066.00
107,166.00
5. Notes and Loans
Receivable
54,000.00
6. Other Assets
51,707.60
34,017.49
162,686.28
Total Assets
$297,254.94
$431,329.30
$627,248.38
Liabilities
Loans Payable
$118,500.00
$209,240.00
$225,352.50
Mortgages Payable
57,951.01
43,912.14
112,061.98
Total Liabilities
$176,451.01
$253,152.14
$337,414.48
Net Worth
$120,803.93
$178,177.16
$289,833.90
Increase (Decrease) in
1963
1964
1965
Net Worth From Prior
Year
$ (7340.25)
$37,443.23 $ 35,994.84 Less: Non-taxable
receipts
(2,066.64)
(4,162.75)
(5,803.85)
Add: Personal Expenditures
53,460.09 50,512.44 78,406.71 Federal Income Taxes
900.00 3,218.00 2,784.00 Adjusted Gross Income
as Corrected
44,953.20 87,010.92 111,381.70 Adjusted Gross Income
Per Return
12,448.00 24,638.00 14,450.00 Understatement of
Adjusted Gross Income
$32,505.20 $62,372.92 $ 96,931.70 Adjusted Gross Income
As Corrected
$44,953.20 $87,010.92 $111,381.70 Corrected Itemized
Deductions
(4,729.50)
(8,781.86)
(10,041.58 Allowable Exemptions
(5,400.00)
(6,000.00)
(6,600.00)
Taxable Income as
Corrected
$34,823.70 $72,229.06 $ 94,740.12 Taxable Income
Per Return
$ 5,403.00 $14,738.00 $ 1,071.00 Understatement of
Taxable Income
$29,420.70 $57,491.06 $ 93,669.12 *299 Increase (Decrease) in
1966
1967
1968
Net Worth From Prior
Year
$ (11,708.56)
$ 57,373.23 $111,656.74 Less: Non-taxable
receipts
(5,117.43)
(6,272.31)
(1,193.84)
Add: Personal Expenditures
101,021.72 63,959.04 89,188.68 Federal Income Taxes
597.80 2,048.60 7,942.80 Adjusted Gross Income
as Corrected
84,793.53 117,108.56 207.594.38 Adjusted Gross Income
Per Return
15,300.00 17,879.00 54,655.00 Understatement of
Adjusted Gross Income
$ 69,493.53 $ 99,229.56 $152,939.38 Adjusted Gross Income
As Corrected
$ 84,793.53 $117,108.56 $207,594.38 Corrected Itemized
Deductions
(7,844.51)
(5,014.15)
(15,200.65)
Allowable Exemptions
(6,000.00)
(5,400.00)
( 5,400.00)
Taxable Income as
Corrected
$ 70,949.92 $106,694.41 $186,993.73 Taxable Income
Per Return
$ 4,886.00 $ 10,511.00 $ 38,956.00 Understatement of
Taxable Income
$ 66,063.92 $ 96,183.41 $148,037.73 3. Kattar's Dealings with James Talcott, Inc.
James Talcott, Inc. (Talcott) was a loan factoring house through which Kattar and his owned or controlled corporations factored their loan portfolios *300 during the years at issue. Kattar's related corporations factored loans (i.e., sold loans to Talcott for sums equal to a percentage thereof) worth a "couple of million dollars." Many of the loans factored through Talcott by Kattar or his related corporations, however, were not what they purported to be. For example, the following amounts were factored through Talcott: 1. A purported loan of $2,500 to Harvey Rooks which never existed; 2. A disbursement of $20,000 to Gerard Laverriere which was not a loan; 3. A payment of $13,000 to Megatron, Inc., purportedly made as a loan to Megatron's treasurer, Vincent Modica. Megatron, however, was dormant at the time and Modica denies having taken such a loan; 4. A payment to Thomas E. Garrity in repayment of his prior loan to Kattar. The payment was fictitiously shown as a loan to Garrity and then factored through Talcott; 5. A Community Finance, Inc. of Lawrence check for $10,000 written to Richard Richter. The check was redeposited to the corporate bank account and charged to an intercompany loan account; 6. A loan of $3,050 to Guy Spezzano made by Community Finance, Inc. of Lawrence in 1965 and repaid by Spezzano later *301 that year. The repayment was never submitted to Talcott. 4. The Kanavos Loans
One of the assets attributed to Kattar by respondent in the net worth computation for 1968 is the amount of $145,441.28 designated as "Additional Capital Contribution - Tri State Development Corp." Respondent's determination with respect to this asset is based on the following series of events: By check dated April 2, 1968, Peter J. Kanavos (Kanavos) paid $139,341.28 through his controlled corporation, Marlboro Investment Corporation, to Community Finance of New Hampshire, Inc. (Community/New Hampshire) as a repayment of principal and interest on several loans taken in his own name, that of Donald Sims who was one of his employees, and Olympic Development Corporation, another of Kanavos' controlled corporations. These loans were carried on the books of Community/New Hampshire, Community Finance of Lawrence (Community/Lawrence), and North American Enterprises, Inc., three of Kattar's controlled corporations; they had been factored through Talcott. Community/New Hampshire deposited Kanavos' payment into an inactive bank account, then withdraw the amount, issuing a check in the same amount, $139,341.28, *302 to Tri-State, another of Kattar's controlled corporations. Community/New Hampshire did not credit the appropriate loans receivable account for any portion of Kanavos' payment. Instead, the payment was recorded on Community/New Hampshire's books as "Loan Payable--Peter Kane," a fictitious liability. Tri-State recorded the $139,341.28 payment received from Community/New Hampshire as "Loan Peter Kane," a fictitious account payable, on its books and on the balance sheet of its consolidated Federal income tax return for its fiscal year ended February 28, 1969; no income was recorded or reflected on the transaction. Tri-State deposited the $139,341.28 into its account on April 11, 1968. Of this sum, Kattar, as Tri-State's treasurer, signed and issued checks over the following one-month period totaling over $93,000 to several of his controlled corporations. On December 24, 1968, Kanavos, again through Marlboro Investment Corporation, issued a check in the amount of $6,100 made payable to "Community Finance" in payment of loan principal and interest. The check was deposited into the account of Community Investment Corp.Community Investment Corp. issued its check dated December 27, 1968, in *303 the amount of $6,100 made payable to Tri-State. Tri-State deposited the funds into its account, and recorded receipt of the $6,100 by adding it to the $139,341.28 already in the Community/New Hampshire's "loan-Peter Kane" account for a total fictitious liability of $145,441.28. This liability appears on Tri-State's consolidated Federal income tax return for its fiscal year ended February 28, 1969. Although the Kanavos loans had been factored through Talcott, Kanavos' repayments were never turned over to Talcott as provided by the factoring contract. The unpaid balances of the Kanavos loans are reflected as outstanding loan balances on Talcott's books as of December 31, 1969. In his summary analysis of the transactions described above, respondent made the following statements with respect to the financial effects of the transactions on Kattar and his controlled corporations: The above payments of April 2, 1968 and December 24, 1968, in fact, liquidated the entire principal balances outstanding on all KANAVOS's indebtedness and the accrued interest on this indebtedness. These payments were received and recorded by KATTAR corporations as to allow the following: a) Allow KATTAR *304 to fraudulently misappropriate these funds for his own personal use; b) Allow the corporations involved to understate their gross income as a result of KANAVOS's payments; c) Allow the corporations involved to reflect, on their records, fictitious liabilities and assets which were, in fact, non-existent. * * * Net Worth Effect
The liquidation of KANAVOS' indebtedness to KATTAR entities resulted in a diversion of $145,441.28 by KATTAR in 1968. The funds were diverted by KATTAR to be used as additional working capital by TRI-STATE DEVELOPMENT CORPORATION. GEORGE T. KATTAR constructively owned 93 percent of the capital stock of this corporation in 1968. Therefore, this diversion of $145,441.28 is reflected on the Net Worth Statement as "Additional Capital Contribution - TRI-STATE DEVELOPMENT CORPORATION". The falsification of corporate records described above which was reflected on the corporate income tax returns of Community Investment Corp. and North American Enterprises, Inc., for the fiscal year ended March 31, 1969, to cover the diversion of the $145,441.28 to Tri-State was the basis of a criminal indictment against Kattar; he pleaded guilty under section 7206(1) *305 to two counts of subscribing Federal income tax returns which he did not believe to be correct. OPINION 1. The Unreported Income
Respondent determined deficiencies in petitioners' income taxes for the years 1963 through 1968 using the net worth/personal expenditures method of income reconstruction. Respondent also determined that petitioners were liable for the addition to tax for fraud under section 6653(b) for those years. As a general rule, the burden of proof with respect to deficiencies is on petitioners, Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), and the burden is on respondent to prove fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). In this case, however, assessment of the deficiencies is barred by the 3-year statute of limitations under section 6501(a)(1) unless the respondent demonstrates that an exception to the usual 3-year statute of limitations is applicable. As to 1967, the statute was entended by agreement to June 30, 1975, sec. 6501(c)(4), and the notice of deficiency was timely mailed on February 26, 1975. *306 [2] Thus, respondent must establish, by clear and convincing evidence, that the return for each of the other years at issue was "false or fraudulent", sec. 6501(c)(1), or, by a preponderance of the evidence, that omitted income for 1968 exceeded 25 percent of the reported gross income. Sec. 6501(e)(1)(A); Armes v. Commissioner,448 F.2d 972, 974 (5th Cir. 1971), affg. in part and revg. and remanding a Memorandum Opinion of this Court; Williamson v. Commissioner,27 T.C. 647, 659 (1957). As a practical matter, therefore, in the circumstances of this case, the burden of proof with respect to the determined deficiencies, except for 1967, as well as the issue of fraud, lies initially with respondent. *307 In this case, the determination of unreported income as well as the existence of fraud necessary to lift the bar of the statute of limitations (Part 2 of this opinion) depends in major part upon respondent's net worth/personal expenditures computation. We must, therefore, examine the validity of respondent's computation in light of the standards set forth by the Supreme Court in Holland v. United States,348 U.S. 121, 129 (1954) and United States v. Massei,355 U.S. 595 (1958).Under those standards, respondent must first establish, with reasonable certainty, an opening net worth. Second, he must establish the annual increases in net worth. Finally, he must show that the increases were derived from taxable sources of income. Respondent can meet this last requirement by establishing either that a likely source of unreported taxable income existed or that he conducted an investigation of leads reasonably susceptible of being checked which, if true, would establish Kattar's innocence of fraud. For the reasons stated below, we conclude that (1) with the exception *308 of the determination as to 1968, respondent's net worth computation complies with the Holland/Massei standards, and (2) respondent has proved, by clear and convincing evidence, that petitioners underpayment of their taxes for 1963 through 1967 was fraudulent. As to 1968, we hold for petitioners. Most of the items in respondent's net worth computation have been stipulated by the parties. The parties disagree, however, with respect to certain items which we shall discuss in turn. a. The "Due To/Due From" Account
One of the assets attributed to Kattar by respondent for each of the years at issue is the appropriate yearend total from the "Due To/Due From" accounts reflecting both amounts expended by Kattar's controlled corporations for his benefit and amounts expended by Kattar on behalf of the corporations. Respondent determined that amounts owed to Kattar by his corporations at the end of each year are assets similar in nature to any other loan receivable which would be an asset in the holder's hands. [3] We agree. *309 The yearend "Due to/Due from" totals used by respondent in the net worth computation are fully supported by the evidence of record. Respondent's agent testified at trial with respect to the figures in the summary schedule of those accounts which is set forth in our Findings of Fact; this summary schedule is based on source documents contained in the record. We conclude that respondent correctly determined that amounts owed to Kattar by his corporations were indeed assets in his hands. Petitioners make two arguments with respect to "Due to/Due from" accounts. First, they contend that respondent has overstated the amounts owed to Kattar by his controlled entities.In support of their contention, petitioners presented a "Due to/Due from" schedule prepared by Yellin, Kattar's accountant. We are, however, unable to accord and evidentiary weight to petitioners' schedule. It does not reflect, as does respondent's schedule, all of the years at issue. Further, it does not provide references to the financial evidence of record of to any other documentary sources which would support the accuracy of Yellin's figures. Finally, Yellin himself admitted that he had no personal recollection *310 of the numbers which he had set forth on the schedule. Thus, we are unable to accept petitioners' wholly unsupported schedule; we sustain the "Due to/Due from" figures as determined by respondent. Petitioners next argue that the positive balances appearing in the "Due to/Due from" schedule should not be considered assets of petitioners', but rather, they contend, such amounts are liabilities in that they represent interest-free loans made to Kattar by his controlled entities. Petitioners misconceive the import of the summary schedule as used by respondent. The testimony of respondent's agent shows clearly that the positive account totals appearing on the schedule represent funds paid out by Kattar to or on behalf of his controlled entities and, thus, represent amounts owed to Kattar by the entities, not money borrowed by Kattar from the entities as contended by petitioners. Thus, respondent determined, correctly in our view, that such amounts are assets of petitioners', not liabilities. We, therefore, sustain respondent's use of the "Due to/Due from" schedule. B. Petitioner's Personal Expenditures
Respondent determined that petitioners made certain personal expenditures *311 during the years at issue. In support of his determination, respondent submitted in evidence an exhibit which lists petitioners' specific expenditures for each of the 6 years supported by documentary evidence of record with respect to each item. In the stipulation of facts, petitioners agreed with respondent's analysis of their personal expenditures with the exception of certain disputed amounts totaling $162,103.17.At trial, petitioners submitted in evidence Yellin's figures for petitioners' personal expenditures. The following is a comparison of the three sets of disputed personal expenditure figures: Personal Expenditures
1963
1964
1965
1966
1967
1968
Respondent
$53,460
$50,512
$78,406
$101,021
$63,959 89,188
Stip. [1]
$32,444
$47,888
$39,603
$ 48,705
41,325
$ 64,477
Yellin
$22,357
$49,816
$68,316
$ 65,540
$43,673
$104,683
As the above comparison makes clear, there is a conflict each year between the figures stipulated to by petitioners and Yellin's analysis. Because Yellin's analysis is unsupported *312 by any references to information, in the record or otherwise, on which it is based, and because Yellin himself admitted to having no recollection with respect to the basis for his figures, we reject it as having no evidentiary value. With regard to the disputed items from respondent's exhibit, petitioners presented evidence in the form of uncorroborated testimony by Kattar with respect to only approximately one-third of the total $162,103.17 of items. We do not find Kattar's testimony convincing. A careful review of respondent's exhibit convinces us that respondent's well documented analysis of petitioners' personal expenditures is more accurate. To the extent that these expenditures came from the corporations, they are taxable to him as compensation for services or as constructive dividends; no issue has been raised as to an allocation between these sources or the adequacy of the earnings and profits. We, therefore, sustain respondent's determination in this regard. C. Respondent's Investigation and the Likely Source Issue
Petitioners assert in very general terms, both that respondent did not conduct a thorough investigation to determine all sources of nontaxable *313 income, and that he has not demonstrated that a likely source of taxable income existed. Noting that respondent is not required to do both, [4] we conclude, nevertheless, that he has satisfied his burden in both respects. Our review of the voluminous evidence submitted by respondent and his detailed analysis of the evidence satisfies us that respondent conducted a thorough investigation and, within that investigation, attempted to identify and adjust for all items of petitioners' nontaxable income. Indeed, in his net worth computation, respondent has credited petitioners with nontaxable receipts totaling some $24,616.82 over the 6-year period at issue. Petitioners *314 have failed to offer any evidence with respect to any leads which respondent may have failed to investigate. A taxpayer cannot complain about the sufficiency of an investigation where he has offered no leads. United States v. Penosi,452 F.2d 217, 220 (5th Cir. 1972); Blackwell v. United States,244 F.2d 423, 429 (8th Cir. 1957). We are also satisfied that respondent has adequately demonstrated that there existed likely sources of taxable income available to petitioners which would explain the determined increases in petitioners' net worth. Kattar and his attorney have both admitted that Kattar was a paid financial consultant during the years at issue and that his "position sitting at the head of the various finance companies, makes it possible for him to receive so-called finders fees or commissions from time to time, which provides him with a very substantial income." Further, respondent points to Kattar's dealings with Talcott as another likely source of taxable income. Kattar admitted that his companies factored a "couple of million" dollars worth *315 of loans through Talcott. Respondent has offered substantial evidence as outlined in our Findings of Fact which demonstrate that many of these loans were not bona fide but rather, in fact, involved diversion of funds which enriched Kattar's controlled entities, thereby enabling his corporations to pay his personal expenses and support his family and his lifestyle, which clearly increased his own wealth as set forth in the net worth computation. D. Capital Contribution to Tri-State
One of the assets attributed to Kattar by respondent and contested by petitioners is an additional capital contribution in 1968 in the amount of $145.441.28 to Tri-State, one of Kattar's controlled corporations.Respondent determined that this amount, consisting of two checks, one for $139,341.28 and the other for $6,100, paid by Peter J. Kanavos on his indebtedness to several of Kattar's controlled corporations, was diverted to and used by Tri-State as working capital. The Kanavos loans had been factored previously through Talcott and upon repayment by Kanavos, Kattar's corporations should have remitted Kanavos' payment to Talcott. Because Kanavos' repayments of the loans were not remitted *316 to Talcott, but rather, were diverted to Tri-State and fraudulently represented on Tri-State's books as a loan payable from an allegedly fictitious person named Peter Kane and used by Tri-State as working capital, respondent determined that Kattar's equity interest in Tri-State increased by that amount, thereby increasing his assets by that amount as well. Petitioners argue that, because the Kanavos' repayments were made to and used by Kattar's corporations, Kattar did not receive the money as taxable income and, therefore, his personal net worth could not have increased by that amount. After a careful review of the evidence on this issue, we are constrained to agree with petitioners. Admittedly, the diversion of the funds in question from Talcott to Tri-State via Community/New Hampshire and Community Investment Corp. was orchestrated by Kattar, who was in control of the corporations involved. Admittedly also, the ill-gotten gains derived from the diversion of funds unlawfully enriched Tri-State and, as a consequence, may have increased concommitantly the fair market value of Kattar's equity interest in Tri-State. Moreover, these illegally obtained funds clearly constitute taxable *317 income to their recipient, see James v. United States,366 U.S. 213, 219 (1961). Nonetheless, as a device for identifying taxable income, the net worth method is concerned with cost-of-acquisition values, not fair market values, Holland v. United States,supra at 125, and there is no evidence to show that Kattar personally, rather than his corporations, received the funds as taxable income either actually or constructively and then contributed them to Tri-State. As set forth in some detail above in our findings, respondent analyzed the various steps involved in the diversion of funds as purely corporate activities. The Kattar corporations made the loans to Kanavos. Kanavos issued his corporate checks payable to "Community/New Hampshire" and "Community Finance." The checks were deposited into corporate bank accounts and, in turn, corporate checks were issued to Tri-State. Respondent has failed to demonstrate that Kattar, in his individual capacity, actually received the funds from Kanavos and then contributed them to Tri-State.The funds were at all *318 times corporate assets. Although not fully articulated, respondent's position may be that by virtue of the facts that Kattar was in control of the corporations involved and that the funds were transferred from Community/New Hampshire and Community Investment Corp. to Tri- State at his direction, Kattar received constructive taxable distributions from Community/New Hampshire in the amount of $139,341.28 and from Community Investment Corporation in the amount of $6,100 which he then contributed to Tri-State. [5] Respondent has not demonstrated, however, that either Community/New Hampshire or Community Investment Corp. had sufficient current or acumulated earnings and profits to support the distribution of a taxable dividend to Kattar under section 316(a). Indeed, respondent has presented no evidence which directly addresses the earnings and profits of either corporation. [6]
*319 In the absence of facts before us as to available earnings and protifs, we are unable to find that Kattar received a taxable constructive dividend on the transfers of funds to Tri-State. Because the object of the net worth computation is to identify the increase in the cost-of-acquisition value of assets as a measure of taxable income, we cannot merely add the increase in the market value of Tri-State to Kattar's assets without evidence that the ill-gotten gain which caused the increase in market value was first taxable income to Kattar as an individual. Respondent's net worth computation set forth in our findings shows an understatement of income of $148,037.73 for 1968. With the elimination of the $145.441.28 Kanavos loan item from the determined understatement, there remains only $2,596.45 compared with reported gross income of $54,655. We hold that respondent has failed to prove that petitioners' 1968 return was fraudulent under section 6501(c)(1), or that the return omitted an amount which is in excess of 25 percent of the amount of gross income stated in the return within the meaning of section 6501(e)(1)(A).The assessment of a deficiency for 1968 is, therefore, barred *320 by the 3-year statute of limitations prescribed by section 6501(a). In sum, we conclude that respondent has shown in a clear and convicing fashion, with the exception of the determination as to 1968, that his net worth computation should be sustained. Petitioners have failed to offer any evidence which would convince us otherwise. 2.Additions to Tax
We have held above that respondent has proved by clear and convincing evidence that petitioners had unreported income for the years 1963 through 1967; there remains the issue of fraud: Whether respondent has shown that petitioners' returns for those years were fraudulent within the meaning of section 6501(c)(1) and whether any part of the underpayment of taxes resulting from petitioners' unreported income for those years was due to fraud within the meaning of section 6653(b). Fraud, for purposes of sections 6501(c)(1) and 6653(b), is defined as an intentional wrongdoing with the specific intent to evade a tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); *321 Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. After considering all of the evidence, we think it is clear that petitioners have engaged in a course of conduct quite obviously intended to conceal their taxable income and, therefore, they are liable for the additions to tax for fraud for the years 1963 through 1967. Petitioners argue that respondent has not proved any of the "badges of fraud" required to sustain his burden of proof in this case; they argue that: "Packing boxes of cancelled checks and mortgages are not, by their bulk, evidence of fraud." This is clearly so, but it is equally true that rarely will a taxpayer openly declare his fraudulent intent; thus, the required intent may be shown by circumstantial evidence and reasonable inferences drawn from the facts. Stone v. Commissioner,56 T.C. 213, 224 (1971); Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). *322 In. other words, petitioners cannot hide behind the packing boxes of documents generated by Kattar's controlled corporations, use these entities to bankroll their personal expenses, engage in fraudulent business practices, and then claim not to have concealed their true income from the Government. When viewed in its entirety, we are convinced that the evidence submitted by respondent clearly demonstrates that petitioners' substantial and repeated omissions of income for 5 consecutive years could have only been the product of intentional wrongdoing with the intent to conceal their true income. All of the evidence leads to the conclusion that Kattar was fully aware of and in sole control of his financial situation. He was in direct and personal control of his own financial affairs and those of his controlled corporations. He was the designated signatory on all of the corporate checking accounts. He used the corporate accounts to support himself, his wife, and his 7 children in a manner far more lavish, we think, than could have been possible considering his reported income. Surely Kattar, a paid financial consultant by profession, was in a position to have known that his income *323 tax returns did not reflect his proper taxable income for the years at issue. Not only, as we have found, did petitioners omit large amounts of income for 5 consecutive years, see, e.g., Estate of Mazzoni v. Commissioner,451 F.2d 197, 202 (3d Cir. 1971), affg. a Memorandum Opinion of this Court; Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), affg. a Memorandum Opinion of this Court, respondent has also shown that Kattar acted fraudulently in his dealings with Talcott, the factoring house; [7] he engaged in fraudulent corporate bookkeeping practices and he pleaded guilty to knowingly signing false income tax returns.Given these facts, we think Kattar was fully capable of concealing, and did in fact attempt to conceal, his income from the Government. Thus, we conclude that the bar of the limitations on assessments has been lifted pursuant to section 6501(c)(1) and that petitioners are liable for the section 6653(b) addition to tax for fraud for the years 1963 through 1967. *324 Neither petitioners nor respondent introduced any evidence with respect to docket No. 2800-74 and docket No. 2040-75. In docket No. 2800-74, involving the 1970 taxable year of petitioners George T. and Phyllis A. Kattar, we sustain respondent's determination in the notice of deficiency inasmuch as petitioners have, by their failure to introduce any evidence, failed to sustain their burden of proof. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In docket No. 2040-75, involving the taxable year ended March 31, 1968, of petitioner The Pittsburgh Corporation, however, we hold in favor of the petitioner. The notice of deficiency in this docket is dated December 5, 1974, more than 3 years after the filing of petitioner's tax return on December 16, 1968. In its Reply to Answer by Commissioner, petitioner specifically pleaded that the 3-year statute of limitations bars assessment of the tax in this case. It is incumbent on respondent, in such circumstances, to prove such facts as will establish that an exception to the usual 3-year statute of limitations is applicable. Farmers Feed Co. v. Commissioner,10 B.T.A. 1069, 1076 (1928). *325 This respondent has failed to do. To reflect the foregoing, Decision will be entered under Rule 155 in docket No. 4567-75.
Decision will be entered for the respondent in docket No. 2800-74.
Decision will be entered for the petitioner in docket No. 2040-75.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All "Rules" references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners filed their 1967 return on or before Apr. 15, 1968 and their 1968 return on June 16, 1969. Petitioners executed a Form 872 on Mar. 15, 1974 extending the statute of limitations on assessment for 1967 to June 30, 1975. The notice of deficiency bears the date Feb. 26, 1975. Thus, the notice of deficiency for 1967 was timely and the 6-year statute of limitations set forth in sec. 6501(e)(1)(A)↩ could only be applicable to the year 1968.
3. Disputes frequently arise as to whether sums advanced by a shareholder to a corporation are loans or capital contributions. We need not deal with that issue here because either a loan payable to petitioner or a capital contribution to one of the corporations would represent a net worth increase.↩
1. The stipulated figures have been calculated by subtracting each year's disputed items from respondent's totals.↩
4. In Holland v. United States,348 U.S. 121 (1954), the Supreme Court held that proof of a likely source is required in a net worth case; however, later, in United States v. Massei,355 U.S. 595↩ (1958), the Supreme Court held that if all possible sources of nontaxable income are negated, there is no necessity for proof of a likely source. Thus, respondent need to only one or the other.
5. See Sammons v. United States,433 F.2d 728, 732 (5th Cir. 1970), in which the court stated: In reality then, the taxpayer took money from his five corporations and placed it in a sixth. It is of little consequence that he personally received no money from the transaction, for it is the power to dispose of income and the exercise of that power that determines whether taxable income has been received. [Citations omitted.] ↩
6. It is true that the consolidated income tax return of Community Investment Corp. and its subsidiaries for the fiscal year ended Mar. 31, 1969, is in the record. The balance sheet for Communty Investment Corp. shows a deficit in the retained earnings account of $167,210 and taxable income of $2,274. The balance sheet for Community/New Hampshire shows a deficit in retained earnings account of $31,946 and a loss in that year of $138,224. Given the differences between retained earnings and earnings and profits, see sec. 312, as well as the discrepancies between the dates of the ends of petitioners' taxable year and the fiscal years of the corporations, these figures cannot be accepted as sufficient to carry respondent's burden of proof.↩
7. In McGee v. Commissioner,61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976), we held: While evidence that a taxpayer was attempting to defraud another in a business transaction may not be direct evidence of fraud with intent to evade tax see Toledano v. Commissioner,362 F.2d 243, 247 (C.A. 5, 1966), the Court is entitled to consider such evidence along with other evidence in determining the intent of the taxpayer in doing certain acts, because it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax.Rogers v. Commissioner,111 F.2d 987 (C.A. 6, 1940). The legal relevancy of such evidence is based upon logical principles which go to negate innocent intent. United States v. Bridell,180 F.Supp. 268 (N.D. Ill. 1960); Pappas v. United States,216 F.2d 515↩ (C.A. 10, 1954). [Emphasis added.]